89 F.3d 1269
 27 Envtl. L. Rep. 20,001
 Kathy STUPAK-THRALL, Michael A. Gajewski, and Bodil
Gajewski, Plaintiffs-Appellants,
v.
UNITED STATES of America and Daniel R. Glickman, Secretary
of Agriculture, individually and in his official
capacity, Defendants-Appellees.
 No. 94-1863.
 United States Court of Appeals,
Sixth Circuit.
 July 23, 1996.
 
 Todd S. Welch (argued and briefed), William P. Pendley, Mountain States Legal Foundation, Denver, CO, for Kathy Stupak-Thrall.
 Todd S. Welch, Mountain States Legal Foundation, Denver, CO, Mark D. Tousignant, Iron River, MI, for Michael A. Gajewski, Bodil Gajewski.
 Peter A. Appel (argued and briefed), U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, Judd R. Spray, Office of the U.S. Attorney, Marquette, MI, for U.S.
 John A. Bryson, Peter A. Appel, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, DC, Judd R. Spray, Office of the U.S. Attorney, Marquette, MI, for Michael Espy.
 Walter Kuhlmann (briefed), Boardman, Suhr, Curry & Field, Madison, WI, for Upper Peninsula Environmental Coalition.
 Before MERRITT, Chief Judge, and BROWN, KENNEDY, MARTIN, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, and COLE, Circuit Judges.
 
 ORDER
 
 1
 The en banc court is equally divided in this case. Seven members favor affirmance of the judgment of the District Court, and seven favor reversal. Hence, as is customary under such circumstances, the judgment of the District Court is affirmed by an equally divided vote.
 
 
 2
 The mandate will not issue for fourteen (14) days from the date of this order so that members of the court may file any separate opinions they wish to.*
 
 
 3
 MOORE, Circuit Judge, concurring in the order.
 
 
 4
 It is unfortunate that after considerable expense of time and effort this case has resulted in no law of the circuit. Under such circumstances, there is undoubtedly little need to engage in lengthy debate in opinions lacking any precedential value. Nevertheless, I believe that due regard for Judge Boggs's opposing view compels a brief explanation of the view favoring affirmance.[1]
 
 
 5
 Throughout this litigation, we have assumed that the plaintiffs' riparian rights may count as "valid existing rights" to which Forest Service regulations are "subject" under the wilderness acts.[2] The Chief of the Forest Service made this assumption when he ruled that the sailboat and houseboat prohibitions at issue in Amendment No. 1 were reasonable regulations that did not constitute a taking and therefore did not violate the "subject to" portion of the "subject to valid existing rights" language of the wilderness acts. Admin. R. 819-20. Even if deference to this interpretation of an ambiguous phrase were not appropriate under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), I would still hold that it was the correct interpretation.[3] All authorities are in agreement that the "subject to valid existing rights" language was essentially designed to restrain agencies from effecting a taking. See Utah v. Andrus, 486 F.Supp. 995, 1010 (D.Utah 1979); Adams v. United States, 3 F.3d 1254, 1259 (9th Cir.1993) (citing Utah v. Andrus 's holding with approval); Symposium on Valid Existing Rights, 5 J. Min. L. & Pol'y 381 (1989-90); Jan G. Laitos & Richard A. Westfall, Government Interference with Private Interests in Public Resources, 11 Harv. Envtl. L.Rev. 1 (1987). Congress, of course, can always take property, provided it pays just compensation (and provided it does not violate due process),[4] but Congress here has instructed the Forest Service not to do so. As a result, the remedy for an overreaching Forest Service regulation, rather than compensation, is an injunction. In other words, the "subject to valid existing rights" language appears to be Congress's "promise" to private property owners that, at a minimum, it will not take their property, even with just compensation.
 
 
 6
 Because we deal in this case with state-created property rights, it is appropriate to recognize that in certain instances, different states may define these rights by providing additional protection from government interference. For example, the government defendants here concede that Michigan has defined riparian rights in such a way that if the Forest Service or local government had attempted to deprive the plaintiffs of the ability to extract drinking water from the lake, the regulation would be invalid, even if it did not constitute a taking. See Thompson v. Enz, 379 Mich. 667, 154 N.W.2d 473, 483 (1967). On the other hand, the actual regulations in this case clearly do not infringe upon any of plaintiffs' core property interests under state law. Therefore, under this approach--a "takings plus" approach that accounts for both state-law property protections and a takings analysis as the federal, minimum standard of protection--there is no basis for invalidating the Forest Service's regulations.
 
 
 7
 Judge Boggs's opposing view essentially takes "subject to valid existing rights" to mean "without affecting valid existing rights in any way."[5] A careful reading of his opinion, however, reveals that this view relies on nothing but his own novel interpretation of the Organic Act, 16 U.S.C. § 551, and the Michigan Wilderness Act. As I have already indicated, all authorities are to the contrary, and Judge Boggs's citations, though copious, are nonetheless almost wholly irrelevant. The opposing view also apparently misunderstands the prior panel's determination that Congress had delegated its police power under the Property Clause to the Forest Service in the Organic Act and wilderness acts. Judge Boggs quotes at length from part IV of the panel opinion in describing the analysis as a "non sequitur." Dissenting opinion at 1290-1291. It is little wonder that he thinks so, since the panel's actual analysis of this point appears in part III. In part IV, the panel simply held that state law, via the "subject to valid existing rights" language, imposed the same restrictions on the Forest Service's exercise of federal police power that it did on a local government's exercise of state police power. See Stupak-Thrall, 70 F.3d at 889-90. This is the "plus" in the "takings plus" approach.
 
 
 8
 I doubt that even the opposing view would hold that the Forest Service's sailboat and houseboat regulations constituted a taking, especially since the district court noted that plaintiffs had failed to produce any evidence that sailboats or houseboats have ever been used on Crooked Lake. See Stupak-Thrall v. United States, 843 F.Supp. 327, 334 (W.D.Mich.1994). Indeed, the opposing view's core discussion of the takings issue is devoted merely to complaining about the scarcity of courts that have been confronted with the issue, and to describing just how "exceedingly difficult" a takings analysis can be. Dissenting opinion at 1295-96. This case, however, does not even come close to presenting such hypothetical difficulties. Although plaintiffs now argue on rehearing, for the first time, that sailboats have been used on the lake, occasional and recreational use of the type suggested by plaintiffs is clearly not enough to establish a taking.[6] Furthermore, although Judge Boggs is correct that statutes are to be interpreted whenever "fairly possible" so as to avoid constitutional questions, United States v. X-Citement Video, Inc., --- U.S. ----, ----, 115 S.Ct. 464, 467, 130 L.Ed.2d 372 (1994), it is certainly not "fairly possible" to do so when the statute is designed to address a constitutional issue.
 
 
 9
 The foregoing approach adopts the prior panel's recognition that plaintiffs' riparian rights have never included the right to be immune from reasonable regulation. Congress chose to "grandfather" private rights in the "subject to valid existing rights" phrase, but in doing so, it never intended that those rights be ossified against further regulation. In employing a takings inquiry, the foregoing approach also makes explicit a narrow limitation on the prior panel's analysis to ensure that the police power is exercised within reasonable bounds. With this slight clarification, I would adhere to the panel opinion in its entirety, and I incorporate it herein by reference. See Stupak-Thrall v. United States, 70 F.3d 881 (6th Cir.1995), vacated, 81 F.3d 651 (6th Cir.1996).
 
 
 10
 Because it is clear to me that Amendment No. 1 did not effect a taking or otherwise violate state-law limits on police power regulation, I believe without hesitation that the district court's judgment upholding the wilderness regulations is properly affirmed.
 
 
 11
 MERRITT, C.J., and DAUGHTREY, J., concur in Judge MOORE'S opinion.
 
 
 12
 BOGGS, Circuit Judge, dissenting.
 
 
 13
 That this case has been controversial is apparent from its effect of splitting our court right down the middle. That at times it involves intricate statutory analysis also cannot be gainsaid. However, as I shall endeavor to demonstrate, it is basically a very simple case.[1] By their interpretation of a statutory phrase embodying an obvious legislative compromise, the district court and the members of the panel that first heard the case, joined now by four other members of this court, rupture that compromise without support in the text of the statute, its legislative history, or the purposes that Congress could plausibly have been attempting to achieve when it enacted the legislation at issue. In the words of Macbeth, the district court and these seven members of our court make the statute's words "keep the word of promise to our ear, and break it to our hope." (Macbeth, act V, sc. 7, lines 50-51).
 
 
 14
 Our usual practice in a case such as this is to issue a simple order affirming the district court's opinion by an equally divided court. The Supreme Court uses a similar practice. I recognize that by writing separately, I am breaking with the usual practice. However, the usual practice is in no sense binding as a rule of law. Examples of deviation from this practice abound. See, e.g., Biggers v. State of Tennessee, 390 U.S. 404, 404 n. 1, 88 S.Ct. 979, 979 n. 1, 19 L.Ed.2d 1267 (1968) (Douglas, J., dissenting) (collecting cases); Standard Indus., Inc. v. Tigrett Indus., Inc., 397 U.S. 586, 90 S.Ct. 1310, 25 L.Ed.2d 590 (1970) (Black, J., dissenting); Jenkins by Agyei v. Missouri, 807 F.2d 657, 661, 687-95 (8th Cir.1986), cert. denied, 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987) (Arnold, J., concurring in part and dissenting in part). Judge Arnold did not even pause to justify his ability to write separately in such a situation.
 
 
 15
 Because most of the rest of this opinion, as well as most of the verbiage previously expended on this case, involves competing uses of terms such as "rights," "privileges," "authority," "regulation," and "delegation," whose concrete application can be rather amorphous, I think it is well at the outset to recognize the struggle of which this case is only a part. Some people, such as the plaintiffs, want to preserve their enjoyment and livelihood on Crooked Lake from those who would destroy them. Others, whether for their own enjoyment or to advance broader principles, wish to destroy the enjoyment and livelihood of the plaintiffs. This struggle has raged from local meetings to Congress to the Forest Service and now to the courts. Our decision fails to recognize that this part of the struggle was essentially lost in Congress by the destroyers. Our unsatisfactory resolution ensures that this struggle will go on, now with less guidance than ever, governed by a district court theory that not one member of this court has indicated agreement with. I therefore dissent.
 
 
 16
 * I recount the facts of this case a bit differently than either the panel or the district court, as the treatment in neither opinion is complete in important particulars.
 
 
 17
 In 1966 the United States purchased the property surrounding the southern portion of Crooked Lake, located in Gogebic County in the upper peninsula of Michigan, just north of the Wisconsin border. The government then made this land part of the Ottawa National Forest and it therefore came under the administration of the Forest Service. The Forest Service constructed a public boat landing at the northern end of Crooked Lake, thereby allowing access to and use of the lake by the general public. The United States owns, and the Forest Service administers, 95% of the land surrounding Crooked Lake while the other 5% of the surrounding area is in private hands. A total of 13 private owners currently hold land abutting Crooked Lake.
 
 
 18
 Section 3(b) of the Wilderness Act of 1964 ("Wilderness Act"), Pub.L. 88-577, 78 Stat. 890 (1964), 16 U.S.C. § 1132(b), required the Secretary of Agriculture, within 10 years of its enactment, to review certain areas of predominantly federal land, determine their suitability for classification as wilderness, and report these findings to the President of the United States. Section 3(c) of the Wilderness Act, 16 U.S.C. § 1132(c), similarly directed the Secretary of the Interior to review all roadless areas of a certain size for possible inclusion in the federal wilderness system. Pursuant to these directives, the Forest Service undertook the first Roadless Area Review and Evaluation ("RARE I"). This effort failed prematurely as a result of a Tenth Circuit injunction against RARE I pending the completion of an environmental impact statement and compliance with the National Environmental Policy Act. Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244 (10th Cir.1973). This led to the initiation of RARE II. RARE II's Final Environmental Impact Statement ("EIS") was completed in January 1979. See generally John Klein-Robbehaar, Judicial Review of Forest Service Timber Sales: Environmental Plaintiffs Gain New Options under the Oregon Wilderness Act, 35 Nat. Resources J. 201, 205-06 (describing the history of the two RARE initiatives). In the RARE II EIS, the Forest Service made the statement that, "Wilderness designation in itself imposes no restrictions on the use of private land within or adjacent to wilderness." It also provided that "non-Federal lands included within boundaries of an area classified as wilderness are not themselves classified." Final Environmental Impact Statement: Roadless Area Review and Evaluation 73 (1979).
 
 
 19
 In 1981, Michael and Bodil Gajewski purchased a six-cabin fishing resort on Crooked Lake catering to fishermen who use motor boats. The resort had been in operation since 1942. Around 1986, Kathy Stupak-Thrall purchased lakefront property from her father that had been in her family since 1939.[2] Under Michigan law (see Section V.D., pp. 1296-1298 infra), Stupak-Thrall and the federal government both possess riparian property rights[3] to use the entire surface of Crooked Lake, for instance for boating and swimming, by virtue of their ownership of land abutting the lake. In reliance on assurances by local representatives of the Forest Service that the designation by Congress of certain portions of the Ottawa National Forest as federal wilderness areas would not affect their riparian rights, Stupak-Thrall purchased her cabin and land from her father, and the other private landowners along the lake decided not to oppose the legislation that implemented this change. Back in 1981, an attempt by the Forest Service to obtain congressional wilderness designation for the area including Crooked Lake had failed.
 
 
 20
 Finally, in 1987, Congress passed the Michigan Wilderness Act ("MWA"). Pub.L. No. 100-184, 101 Stat. 1274 (1987). The MWA created ten new wildernesses, including the Sylvania Wilderness Area, as they were proposed in the RARE II survey. See Section 6 of the MWA. Most of Crooked Lake was included within the wilderness area. Only the small, northernmost bay of this lake remains outside the Sylvania Wilderness. The MWA incorporated the Sylvania Wilderness and its portion of Crooked Lake into the federal wilderness system created by the Wilderness Act. Section 5 of the MWA conferred on the Forest Service, in relation to the Sylvania Wilderness, all of the broad powers to regulate that the Forest Service had under the Wilderness Act, but provided that these powers were only to be exercised "subject to valid existing rights."
 
 
 21
 Private landowners like Kathy Stupak-Thrall and the Gajewskis became aware of Forest Service proposals to ban motorboating on Crooked Lake, something they believed would violate their riparian rights under Michigan law. Kathy Stupak-Thrall asked her congressman to make inquiries of the Forest Service in an attempt to put pressure on the regulators and gain more information about the agency's intentions. In response to one such inquiry from Congressman Robert Davis, the local Forest Supervisor, Dave Morton, partially allayed concerns over proposed restrictions concerning use of the surface of Crooked Lake by writing to Davis:
 
 
 22
 Congressional hearings and testimony leading to the passage of the [Michigan] Wilderness Act indicated strong support for and recognition of motorized use on these lakes.... [T]his motor boat use is a pre-existing right and may be allowed to continue.... [W]e may find ... that there may be a need to regulate it ... [h]owever, this may also require some change in State of Michigan rules/regulations governing use of motors.... Our feeling is that some sort of compromise will be needed. Without the original Congressional compromise of accepting established pre-existing valid right of motorized use on Crooked, Big Bateau, and Devils Head lakes, we feel that we would not have a Sylvania Wilderness today.
 
 
 23
 (Emphasis supplied.) This letter eventually became part of the administrative record.
 
 
 24
 Despite assurances like these, in January 1990, the Forest Service began to consider substantial amendments to the regulations governing the land in the Ottawa National Forest. On April 20, 1992, the Forest Service released the final version of its changes to the Forest Management Plan, called Amendment No. 1. Among other things, Amendment No. 1 prohibited the use of sail-powered watercraft, watercraft designed for or used as floating living quarters and the use of nonburnable disposable food and beverage containers.[4] The Amendment also provided that motor boating would be allowed to continue, but would be subject to a future Forest Management Plan amendment. While not a part of the appeal in this case, another regulation, Amendment No. 5, has now been promulgated by the Forest Service. Amendment No. 5 confirmed Stupak-Thrall's fears--it restricted motorboating on Crooked Lake.[5]
 
 
 25
 On June 4, 1992, Thrall filed an administrative appeal with the Forest Service, challenging Amendment No. 1 under 36 C.F.R. § 217.3(a)(1), (b) (permitting appeal to Forest Service of Forest Management Plans or amendments). She appealed on two grounds: First, she argued that her riparian rights on Crooked Lake constituted "valid existing rights" within the meaning of the MWA and that the Amendment unlawfully destroyed those rights. Second, Thrall argued that Amendment No. 1 constituted a "taking" of her property contrary to the Fifth Amendment. On October 23, 1992, the Regional Forester issued a decision denying Thrall's appeal based on his conclusion that the "valid existing rights" language in the MWA referred only to privately-held subsurface mineral rights, and perhaps only to mineral rights in the Nordhouse Dunes Wilderness Area.[6] The Regional Forester concluded he could not address a takings claim in the context of an administrative appeal.
 
 
 26
 On December 8, 1992, the Chief of the Forest Service accepted discretionary review of the decision of the Regional Forester pursuant to 36 C.F.R. § 217.17. On January 7, 1993, he rendered his decision. He upheld the Regional Forester's interpretation of the "valid existing rights" language as intending to protect only subsurface mineral rights in the Nordhouse Dunes Wilderness Area. He went on to argue that even if the riparian rights claimed by Stupak-Thrall were valid existing rights, the Forest Service could restrict these rights, so long as such restrictions did not rise to the level of a taking. He rested this argument on precedent interpreting the same phrase, "valid existing rights," in the Federal Land Policy and Management Act of 1976 ("FLPMA"). Stupak-Thrall's administrative remedies were then exhausted.
 
 
 27
 On March 5, 1993 Kathy Stupak-Thrall filed suit in federal district court to enjoin Amendment No. 1 from interfering with her riparian rights on Crooked Lake and seeking damages for an uncompensated regulatory taking. The same day, the Gajewskis filed a complaint seeking identical relief. The district court denied a government motion to dismiss the Gajewskis' suit for failure to exhaust their administrative remedies and consolidated their action with Kathy Stupak-Thrall's.[7]
 
 
 28
 After cross-motions for summary judgment were filed, the district court granted summary judgment to the government on January 25, 1995. Stupak-Thrall I, 843 F.Supp. at 327-33. The district court held that under the plain meaning of the phrase "valid existing rights," all state-created property rights were saved from regulation by the Forest Service. It rejected the argument that the phrase protected only mineral rights in the Nordhouse Dunes Wilderness area. The government did not cross-appeal this ruling. Some Michigan riparian rights are subject to a reasonable use limitation--one riparian cannot use his rights in a way that unreasonably infringes on other riparians. Without specifying exactly how this state law concept had become embedded in the MWA's "valid existing rights" language, the district court held that the validity of any regulations issued by the Forest Service should be judged by the reasonable use doctrine in Michigan riparian law--a peculiar twist on this doctrine. The district court held that Amendment No. 1 was valid because this regulation was reasonable, not because Stupak-Thrall's use of Crooked Lake was unreasonable. Stupak-Thrall and the Gajewskis filed a timely notice of appeal. In order to allow the appeal to proceed in light of Fed.R.Civ.P. 54(b), the district court dismissed the takings claim without prejudice.
 
 
 29
 A panel of our court affirmed the district court's grant of summary judgment to the government, but on different grounds. Stupak-Thrall II, 70 F.3d at 882. The panel stated:
 
 
 30
 We do not agree that the "reasonable use" doctrine governs the federal government's actions in this case. Although the Thompson [v. Enz, 379 Mich. 667, 154 N.W.2d 473 (1967) ] decision is important here because it shows that the riparian rights of private citizens are not absolute under Michigan law, the "reasonable use" doctrine itself only makes sense when one riparian owner challenges another's use as unreasonable and the court makes a subsequent determination of reasonableness. It is inapplicable when one riparian proprietor unilaterally decides to ban certain uses of others, whether or not the uses themselves are unreasonable, and whether or not the banning proprietor actually has the power to do so. Indeed, the federal government's ability to impose the restrictions does not stem from its status as a fellow riparian proprietor; it stems from its status as a sovereign. Its authority to regulate cannot come from a state law doctrine that merely balances the property rights of private owners vis-a-vis one another.
 
 
 31
 Id. at 889 (citation omitted). Instead, the panel concluded that Amendment No. 1 was a valid exercise of the powers possessed by the federal government under the Property Clause of the Constitution. In essence, the panel held that Congress had delegated regulatory powers to the Forest Service coextensive with the police powers possessed by local governments in the State of Michigan. Id. at 889-91. This court vacated the panel's opinion on April 11, 1996 and heard oral argument in the case en banc on June 12, 1996.
 
 
 32
 II. THE PROPERTY CLAUSE AND CONGRESS'S AND THE FOREST
 
 
 33
 SERVICE'S ABILITY TO DESIGNATE AND MANAGE PARTLY
 
 PRIVATE PROPERTY AS WILDERNESS
 
 34
 Stupak-Thrall contends that Amendment No. 1 is invalid for two groups of reasons that can be treated together and dispensed with rather easily. First, she argues that Amendment No. 1 is outside the bounds of Congress's Property Clause authority because the riparian rights at issue are not entirely publicly-owned. On the same basis, although it is a bit unclear, Stupak-Thrall argues either that Congress lacks the ability to designate partly private areas as wilderness or that the Forest Service lacks the authority to regulate partly private areas as wilderness.
 
 A. Property Clause
 
 35
 As the district court and the panel correctly held, the Property Clause[8] and the Necessary and Proper Clause[9] of the Constitution gives Congress all the power it would have needed to make Amendment No. 1 law. In a basic case where only the regulation of land is involved, it should be obvious that Congress has the power to regulate bordering private land when such regulation is necessary to protect public land. For a discussion of the well-established law on this point see the panel's opinion. Stupak-Thrall II, 70 F.3d at 884-86. Even easier is this case, however, as the riparian rights allegedly destroyed by Amendment No. 1 are shared between the federal government and Stupak-Thrall. Thus, the federal government's regulation of its own property is inseparable from its regulation of Stupak-Thrall's property. Unless Congress is to be denied the power to regulate its own property, something it surely cannot be denied on the basis of the Property Clause itself, regulations like Amendment No. 1 must be constitutional. This is not to say that Stupak-Thrall's co-ownership of the riparian rights being regulated by Amendment No. 1 is irrelevant to this case, simply that it is irrelevant for the purposes of Property Clause analysis.
 
 
 36
 B. Congress's and the Forest Service's Classification Authority
 
 
 37
 1. Designation of Federally-Owned Areas as Wilderness under
 
 
 38
 the Wilderness Act
 
 
 39
 Stupak-Thrall's argument that the Forest Service has no authority to classify part of Crooked Lake as wilderness should be dealt with in the same way as her Property Clause argument. To support her contention, Stupak-Thrall points to Section 2(a) of the Wilderness Act, which provides as follows: "[The] National Wilderness Preservation System [is] to be composed of federally owned areas designated by Congress .... and no Federal lands shall be designated as 'wilderness areas' except as provided for in this Act or by a subsequent Act." 16 U.S.C. § 1131(a). Section 2(a), says Stupak-Thrall, clearly denies the Forest Service the authority it claims for Amendment No. 1 because the surface of Crooked Lake is not federally-owned property. The most important problem with this argument is that Congress specifically indicated in Section 2(a) that subsequent laws could designate new wilderness areas. In this case, Section 3(b) of the MWA, enacted in 1987, designated the Sylvania Wilderness as a wilderness area. Thus, the Wilderness Act's apparent requirement that wilderness areas would have to be federally-owned is irrelevant in light of the subsequent enactment of the MWA, which includes in its boundaries parts of Crooked Lake, a body of water not owned entirely by the federal government. And even if the Wilderness Act did not allow for subsequent designations of wilderness areas, it would remain true that one Congress cannot bind a subsequent one absent a constitutional barrier. There is no such constitutional concern in this case. The Wilderness Act cannot be used to prevent a later Congress from designating as a wilderness anything it sees fit.
 
 
 40
 Perhaps sensing this difficulty, Stupak-Thrall at times claims that provisions like Section 2(a) of the Wilderness Act prevent the Forest Service from managing a non-federally owned area as wilderness. This is a bit of wishful thinking on Stupak-Thrall's part--Section 2(a) speaks only of the designation of wilderness areas, not of their management by the Forest Service. See Stupak-Thrall II, 70 F.3d at 887.
 
 
 41
 2. RARE II and Its Incorporation into the MWA
 
 
 42
 Stupak-Thrall places emphasis on two statements in RARE II that she claims establish that Congress could not have intended for areas with any kind of private ownership to be managed as wilderness areas. Both of these statements were set forth in Section I, at p. 11. Neither leads to the conclusion either that partly private areas, such as Crooked Lake, cannot be designated or classified as wilderness or, more importantly, that the Forest Service cannot manage as wilderness any area, public, private, or mixed, that is designated or classified by Congress as wilderness. It is true that Section 6 of the MWA incorporates RARE II, but the statements Stupak-Thrall points to in RARE II do not support her argument.
 
 3. Administrative Classification
 
 43
 Stupak-Thrall also argues that the Forest Service has admitted that Crooked Lake is not federal land. This purported admission exists in the Forest Service's internal administrative coding of Crooked Lake for the purpose of making congressional reports and remitting payments to state governments and their subdivisions. Forest Service maps indicate five different kinds of ownership: (1) national forest system; (2) state; (3) county; (4) private; and, (5) "other." Crooked Lake is classified as "other," presumably because ownership rights in the lake are mixed. Even ignoring the most significant problem with considering this administrative coding evidence, that it is not contained in the record, it has absolutely no significance. It establishes only what is already clear under Michigan law--ownership rights in Crooked Lake are shared between the United States, Stupak-Thrall, and possibly the State of Michigan, depending on whether the lake is navigable. This administrative coding does not establish that Crooked Lake cannot be regulated because it is not purely federal land--the conclusion urged upon the court by Stupak-Thrall. Kathy Stupak-Thrall's argument from a Forest Service official's letter to her husband, Ben Thrall[10], explaining the administrative coding and noting that payments made to counties in lieu of taxes treat Crooked Lake as private property, is similarly irrelevant and relies on extra-record evidence. Actually contained within the record, however, is a document entitled "Preferred Alternative Land and Resource Management Plan--Draft Environmental Impact Statement, 1985." The accompanying map states: "The management areas identified on this map and the management direction defined in the forest plan apply to national forest system lands only. They do not apply to any lands in state, county, private, or other ownership." Although the map is very difficult to read because it was poorly reproduced in the court's joint appendix, I will assume, as Stupak-Thrall warrants, that the map shows Crooked Lake as falling outside the boundaries of the management areas identified on the map. This document does not establish that the Forest Service cannot manage Crooked Lake as a wilderness area, however. This evidence merely shows a plan for management that (1) predates the enactment of the MWA and therefore has no relevance to the authority the Forest Service was delegated by Congress in 1987, and (2) only shows the Forest Service's present intentions, not its view of the limits of its jurisdiction.
 
 
 44
 There are other significant problems with Stupak-Thrall's position on this issue, as well. The government asked at oral argument for the court to assume that Crooked Lake is navigable under state law. If this is a valid assumption[11], then the nature of the various rights in Crooked Lake under Michigan law is as follows: (1) Michigan holds the waters in trust for its citizens and has the right to navigate them and improve their navigation[12]; (2) Michigan's citizens have the right to navigate the waters; (3) riparian owners have the right to use the waters for various reasonable purposes subject to the public's navigation rights; and, (4) riparian owners hold title to the bed of the lake in proportion to the land they own abutting the lake.[13] Peterman v. State, 446 Mich. 177, 521 N.W.2d 499, 508-09 (1994) (state holds in trust navigable lake waters and has right to improve navigation; riparian owners' rights are subject to these public rights); West Mich. Dock & Market Corp. v. Lakeland Investments, 210 Mich.App. 505, 534 N.W.2d 212, 216 (1994) (riparian owners have the right to use the surface of the whole lake for boating, swimming, fishing, and other similar riparian activities); Hall v. Wantz, 336 Mich. 112, 57 N.W.2d 462, 464 (riparian proprietors own to the middle of the lake); Gregory v. LaFaive, 172 Mich.App. 354, 431 N.W.2d 511, 515-16 (1988) (method of determining ownership of bed by riparian owners depends on shape of lake).
 
 
 45
 Given this scheme of ownership, it is clear that the federal government, as a fellow riparian of Stupak-Thrall, does have some ownership rights under Michigan law in the waters of Crooked Lake. Thus, Stupak-Thrall's contention that the lake is private property must be rejected. Section 2(a) of the Wilderness Act does not deny the Forest Service the regulatory authority for Amendment No. 1.
 
 
 46
 Stupak-Thrall's alternate argument that the existence of some private rights in Crooked Lake's waters precludes designating any portion of the lake as wilderness also must be rejected. Sections 4(d)(3) and 5(b) of the Wilderness Act clearly contemplate the exploitation of private, subsurface mineral rights in wilderness areas. 16 U.S.C. § 1133(d)(3) & 1134(b). Furthermore, Section 5(a) of the Wilderness Act 16, U.S.C. § 1134(a), and Section 9 of the MWA contemplate private holdings being wholly contained within wilderness areas. Both sets of provisions therefore indicate that, in situations where territorial rights are mixed and in situations where private territory is surrounded by federal land, the government can include such mixed or surrounded land within a wilderness area. The portion of Crooked Lake that Congress included within the Sylvania Wilderness arguably qualifies for inclusion in a wilderness area under both of these formulations--rights to it are mixed and the portion designated as wilderness is surrounded by government-owned land.
 
 4. Non-Creation of Buffer Zones
 
 47
 Stupak-Thrall makes a final series of arguments for why a portion of Crooked Lake could not have been included in the Sylvania Wilderness that draw primarily on an admonition by Congress to avoid the creation of buffer zones:
 
 
 48
 Congress does not intend that designation of wilderness area in the State of Michigan [will] lead to the creation of protective perimeters or buffer zones around each wilderness area. The fact that nonwilderness activities or uses can be seen or heard from areas within the wilderness shall not, of itself, preclude such activities or uses up to the boundary of the wilderness.
 
 
 49
 Section 7 of the MWA. So the obvious argument is as follows: Crooked Lake is private property and therefore it cannot be included within a wilderness area for the purposes of creating a buffer zone to protect the federally-owned land included in the wilderness from the sights and sounds of sailboating and houseboating on the lake. Stating the argument in this way serves to rebut it, for it really is a restatement of the arguments already refuted above. It is Congress and not the Forest Service that designated part of Crooked Lake as wilderness and the anti-buffer zone provision in Section 7 of the MWA, even if it applies in this situation, cannot thwart a contemporaneous act of Congress. Moreover, given that Crooked Lake is partly public and partly private, designating part of it as a wilderness area does not create a buffer zone at all, in the sense of a protective ring of purely private land (or waters) around a federally-owned wilderness area.
 
 
 50
 In the same breath as she cites the anti-buffer zone provision, Stupak-Thrall points to Section 5(c), 16 U.S.C. § 1134(c), of the Wilderness Act:
 
 
 51
 Subject to the appropriation of funds by Congress, the Secretary of Agriculture is authorized to acquire privately owned land within the perimeter of any area designated by this Act as wilderness if (1) the owner concurs in such acquisition of (2) the acquisition is specifically authorized by Congress.
 
 
 52
 Stupak-Thrall argues that she never consented to the acquisition of her rights on Crooked Lake and therefore it was unlawful for part of Crooked Lake to be designated a wilderness area. In point of fact, Section 5(c) itself is probably the most damning piece of evidence against such an argument. Section 5(c) specifically contemplates that privately owned land can be contained within the perimeter of a wilderness area. See also Section 5(b), 16 U.S.C. § 1134(b), which requires the Secretary of Agriculture to allow access to "surrounded" valid mining claims. Therefore, given Section 5(c), there is even more reason to conclude that Crooked Lake, which is only partly private, can be included within the perimeter of a wilderness area.
 
 
 53
 Despite Stupak-Thrall's arguments, Congress undoubtedly has the constitutional power under the Property Clause to issue Amendment No. 1. Furthermore, there are no barriers in the MWA, the Wilderness Act, or the Forest Service's administrative conduct to the congressional designation of Crooked Lake as a wilderness area. Stupak-Thrall must recognize that these arguments are weak. The real issue in this case is the nature of the Forest Service's authority to regulate the Sylvania Wilderness as defined in the MWA.
 
 
 54
 III. THE FOREST SERVICE'S AUTHORITY UNDER THE WILDERNESS ACTS
 
 
 55
 Stupak-Thrall owns land abutting Crooked Lake. Prior to the enactment of the MWA, no one doubts that she could swim, boat, fish, and make many other uses of the waters anywhere on the lake. There are a substantial number of people in the country who dislike humans engaging in such activities on Crooked Lake. They prefer to maintain "wilderness values," keeping wildernesses as nearly as possible pristine places untouched by the human hand--"area[s] where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c) (Section 2(c) of the Wilderness Act). Therefore, such individuals want the power to prevent or limit some or all of these activities. This is, of course, a perfectly reasonable goal for those holding this opinion to pursue through the legislative process. But, I do not think that it can be seriously maintained that the Forest Service has the ability to stop Americans from doing anything that they want to do or have property rights under state law to do without a source of congressional authority. "[A]n agency literally has no power to act ... unless and until Congress confers power upon it." Louisiana Public Serv. Comm'n v. FCC, 476 U.S. 355, 374, 106 S.Ct. 1890, 1901, 90 L.Ed.2d 369 (1986). This case is about whether the Forest Service has the authority it claims to have for issuing Amendment No. 1. While some of Stupak-Thrall's arguments related to the Forest Service's authority are quite weak, her challenge to the Forest Service's authority in relation to its regulation of "valid existing rights" is undeniably strong.
 
 
 56
 The case before us directly involves only the power of the Forest Service to stop sailboats and houseboats from moving about on Crooked Lake and to ban the usage of nonburnable disposable food and beverage containers, but counsel for the Forest Service admits that the same rationale behind Amendment No. 1 also would be a source of power to prohibit ice skating, swimming, fishing, and all similar riparian uses. A different case in the United States District Court for the Western District of Michigan involves Amendment No. 5, which bans motorboat use on Crooked Lake. The powers the Forest Service claims here sweep broadly, indeed. What is the source of the authority claimed by the Forest Service and what are the limits of that grant of authority? Does Amendment No. 1 fall within the grant of authority claimed?
 
 
 57
 Various answers to these questions have been proposed in the opinions of the Regional Forester, the Chief Forester, the district court, and the panel, in the Forest Service's briefs and oral arguments, and in Judge Moore's concurring opinion upon rehearing en banc. As I shall endeavor to prove, not one of these theories accords with any remotely sensible reading of the statute or with a thorough understanding of Michigan riparian law.
 
 
 58
 I begin with the text of the two most salient statutes. First, Section 4(c) of the Wilderness Act provides:
 
 
 59
 Except as specifically provided for in this Act and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this Act and, except as necessary to meet minimum requirements for the administration of the area for the purpose of the Act (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.
 
 
 60
 16 U.S.C. § 1133(c) (emphasis supplied).[14] The district court, the panel, and the government in oral argument before the panel[15] all erred in lumping this provision in with a similar one in the MWA. Stupak-Thrall I, 843 F.Supp. at 330; Stupak-Thrall II, 70 F.3d at 883-84 & n. 3. The "subject to existing private rights" limitation in Section 4(c) of the Wilderness Act only applies to bans on commercial enterprises and permanent roads. Obviously, the building of permanent roads has nothing to do with this case. And while the Gajewskis maintain a resort on Crooked Lake, they have not made any claim that Amendment No. 1 is designed to ban their commercial enterprise because it is a commercial enterprise, even though, if the Forest Service does have the powers it claims here, then the Gajewskis' resort business may be seriously injured or totally destroyed. Moreover, Section 4(c) does not give the Forest Service any real discretion to promulgate regulations that would permit commercial enterprises or permanent roads in wilderness areas, except for administrative and emergency purposes. Therefore, Section 4(c)'s "subject to existing private rights" language is wholly inapplicable to this case.
 
 
 61
 The most important statutory provision for the purposes of this case is contained in Section 5 of the MWA:
 
 
 62
 Administration of Wilderness Areas-- Subject to valid existing rights, each wilderness area designated by this Act shall be administered by the Secretary of Agriculture in accordance with the provisions of the Wilderness Act of 1964 governing areas designated by the Act as wilderness areas except that with respect to any areas designated in this Act, any reference in such provisions to the effective date of the Wilderness Act of 1964 shall be deemed to be a reference to the effective date of this Act.
 
 
 63
 (Emphasis supplied.) Section 5 is the only source of power the Forest Service can legitimately point to as a basis for regulating Crooked Lake. The MWA placed the Sylvania Wilderness, in the Ottawa National Forest, within the wilderness system administered by the Forest Service. This development allowed the Forest Service to regulate the Sylvania Wilderness and those portions of Crooked Lake within it according to the powers granted to the Forest Service in the Wilderness Act. Thus, the sort of authority the Forest Service has to regulate in this case must come from the Wilderness Act. Neither the Forest Service, the district court, nor the panel paid very much attention to this threshold issue, but the statutory powers the Forest Service is exercising in this case must derive from Section 4(b) of the Wilderness Act:
 
 
 64
 Except as otherwise provided in this Act, each agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character. Except as otherwise provided in this Act, wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use.
 
 
 65
 16 U.S.C. § 1133(b). Amendment No. 1 is undoubtedly within the Forest Service's powers under Section 4(b) of the Wilderness Act. Its avowed purposes and functions are to preserve the wilderness character of the lands and waters within the Sylvania Wilderness.
 
 
 66
 The Forest Service also claims that it has the authority to regulate under both the Property Clause and the Organic Act of 1897 ("Organic Act"). As is clear from its terms, however, the Property Clause grants authority only to Congress. Of course, Congress can delegate that power to an administrative agency, such as the Forest Service, but that is exactly the point--the Property Clause itself grants no powers without a delegation to the Forest Service.
 
 
 67
 The Organic Act, 16 U.S.C. § 551, is applicable to this case because it was the source of authority originally used by the Forest Service to create wildernesses. The Wilderness Act emerged in part as an effort to ensure that the Forest Service could not eliminate wilderness areas administratively. H.R.Rep. No. 1538, 88th Cong., 2d Sess. 8, reprinted in 1964 U.S.C.C.A.N. 3615, 3616 (1964); Michael McCloskey, The Wilderness Act of 1964: Its Background and Meaning, 45 Or. L.Rev. 288, 296 (1966). Moreover, the Wilderness Act specifically states that it is not intended to displace the Organic Act. 16 U.S.C. § 1133(a)(1) (Section 4(a)(1) of the Wilderness Act). The Organic Act provides as follows:
 
 
 68
 The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may be hereafter set aside ... and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction....
 
 
 69
 The phrases "insure the objects of such reservations" and "regulate their occupancy and use" could be read broadly to give the Forest Service the power to issue Amendment No. 1. However, as Stupak-Thrall correctly points out, the Organic Act is the product not of modern environmentalism--the wilderness values embodied in Section 2(c) of the Wilderness Act--but of the earlier ethos of conservation from the Progressive movement that formed a solid plank of Teddy Roosevelt's administration. See Ronald H. Rosenberg, "Evolving Consensus: the Dynamic Future of Environmental Law and Policy," 27 Loy. L.A. L.Rev. 1049, 1049 n. 2 (1994) (explaining the genesis of modern environmentalism in the dispute involving John Muir, founder of the Sierra Club, with the City of San Francisco over the creation of the Hetch Hetchy Dam).[16]
 
 
 70
 The first wilderness area to be set aside administratively under the Organic Act, for instance, was created in 1924 in the Gila National Forest in New Mexico, 27 years after the enactment of the Organic Act. H.R. Rep. 1538, reprinted in 1964 U.S.C.C.A.N. at 3616. The focus of the Organic Act is on preventing destruction by fire and depredations of the national forests and to encourage their use. Preserving "wilderness character" is a very different endeavor from that envisioned by the Congress that enacted the Organic Act. While the government cites no cases to support the conclusion that the Organic Act alone would permit the promulgation of regulations like Amendment No. 1, this conclusion can be assumed without conceding anything of significance here.[17] Because specific statutes and language within statutes control over general statutes and language, the existence of the Organic Act in the background of our case has little relevance in light of the important limitation contained the MWA relating to "valid existing rights." FDIC v. Bates, 42 F.3d 369, 372 (6th Cir.1995) (specific language) (citing D. Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704 (1932)); Edward D. Rollert Residuary Trust, Genesee Merchants Bank and Trust Co., Trustee v. Commissioner, 752 F.2d 1128, 1133 (6th Cir.1985) (specific statute) (citing HCSC-Laundry v. United States, 450 U.S. 1, 6, 101 S.Ct. 836, 838-39, 67 L.Ed.2d 1 (1981)). This resolution of the problem of how the Organic Act applies to wilderness area administration also avoids construing 16 U.S.C. § 480[18], which can also be interpreted to protect state-created property rights from regulation by the Forest Service.[19]
 
 
 71
 The important point to recognize is that the powers the Forest Service possesses under Section 4(b) of the Wilderness Act and under the Organic Act are "subject to valid existing rights" under Section 5 of the MWA. It cannot be disputed that Section 5 of the MWA constitutes a limitation on the Forest Service's powers. The core issue in the case is therefore whether this "subject to valid existing rights" language in Section 5 is a limitation that would preclude either the adoption of or application to Stupak-Thrall of Amendment No. 1.
 
 IV. APPLICATION OF CHEVRON
 
 72
 We review the district court's analysis of such a question de novo because all that is involved is statutory interpretation. Nixon v. Kent County, 76 F.3d 1381, 1386 (6th Cir.1996) (en banc). There are no disputed factual issues in this case and therefore there is no need even to state the standard of review on summary judgment relating to evidentiary matters. If the "valid existing rights" language of Section 5 of the MWA, properly construed, allows Amendment No. 1 to be applied to Stupak-Thrall, then the district court's grant of summary judgment must be affirmed. If there is no such proper construction, then it follows that summary judgment must be reversed.
 
 
 73
 One of the most significant structural linchpins on which the legitimacy of the modern administrative state hinges is the fact that the clear text of statutes inexorably binds and will be enforced by federal courts against administrative agencies. If this were not true, our federal laws would be written by unelected bureaucrats and not by the people's chosen representatives. This important structural feature of government is embodied in so-called Chevron review by the federal courts of administrative regulations, adjudications, and other forms of agency action. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984), sets up the following two-step procedure for judicial review of an agency's regulations:
 
 
 74
 When a court reviews an agency's construction of the statute which it administers it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 75
 This case is clearly resolvable on step one of the Chevron analysis. Section 5 of the MWA grants to the Forest Service the power to regulate various new wilderness areas in Michigan, including the Sylvania Wilderness, in accordance with the Wilderness Act. However, this power is "subject to valid existing rights."[20] The statute could not be clearer--the Forest Service cannot regulate in a way that invades or destroys "valid existing rights." It seems beyond cavil to me that the phrase "valid existing rights" refers to property rights, most of which are created by state law, protecting them from invasion or disparagement by the Forest Service.
 
 
 76
 The concurrence on rehearing en banc implies that the phrase "subject to" is ambiguous. Op. at 1270 & n. 3. The meaning of "subject to" is actually highly definite. The most appropriate meanings given by Black's Law Dictionary are "subordinate" and "subservient." Black's Law Dictionary 1278 (5th ed.1979). If the regulatory powers delegated to the Forest Service are sufficient to destroy certain riparian rights in their entirety, it should be obvious that those regulatory powers are not seriously limited by, let alone made "subordinate" or "subservient" to, those state-created rights. Fulfilling the "subject to" condition requires that the protected "valid existing rights" not be destroyed or disparaged by Forest Service regulation.
 
 
 77
 Black's Law Dictionary defines a "right" in two senses, an abstract sense and a concrete sense. Obviously, because the word "right" in Section 5 of the MWA is modified by the word "existing," a concrete meaning for the word "right" is plain on the face of the statute.[21] In this case the most appropriate meaning of the word "right" is "an interest or title in an object of property." Black's Law Dictionary 1189 (5th ed.1979). Michigan law establishes that Stupak-Thrall has the riparian property right to sail and boat on the entire surface of Crooked Lake. Peterman v. State, 446 Mich. 177, 521 N.W.2d 499, 507-08 (1994) (" 'riparian rights are property' " and as such "are protected by [the] limits of the power of eminent domain") (quoting Bott v. Commission of Natural Resources, 415 Mich. 45, 327 N.W.2d 838, 850 (1982)); People v. Hulbert, 131 Mich. 156, 91 N.W. 211, 211-12 (1902) (riparian rights include rights to "fishing, wading, bathing, swimming, washing sheep, watering cattle, pigs, and horses, washing vehicles and clothing, cutting ice, boating, sailing, etc.") (emphasis supplied).
 
 
 78
 The word "existing" limits those rights protected from invasion by Forest Service regulations to those rights that predate the enactment of the MWA. In this case the riparian rights at issue clearly predate the enactment of the MWA. See, e.g., Hulbert, decided in 1902. The government maintained at oral argument that the rights Stupak-Thrall claimed as part of her "bundle" of sticks (sailing, boating, fishing, swimming, waterskiing, sledding, and ice skating) were not property rights, but simply activities that "no one [had] stopp[ed]." The following exchange[22][22] shows the argument made by the government and a significant concession that really puts an end to the problem of how to resolve this case:
 
 
 79
 Q So do I understand then that if the Forestry Service is to get away with a regulation that proscribes sailboating, it's because sailboating is [an] unreasonable use of one's riparian rights?
 
 
 80
 Government It's because under our reading of the Michigan--it's because number one under our reading of Michigan case law, the right to sailboat standing alone is not a stick. The fact that they could do it beforehand is, that they had a license, that no one was stopping them....
 
 
 81
 Q Your sticks sort of have an abstract life. They exist as, I'm not trying to be funny, they exist as intellectual concepts.
 
 
 82
 Government Well, all of this is a very academic enterprise, but it's, what we're getting down to is the distinction between the fact that no one was stopping you and a right and what we're saying is the fact that no one was stopping you does not equal a right.
 
 
 83
 Q But if the Michigan courts next week rule that it has always been a principle of Michigan law that you can swim on the lake, is it then your position that you can[ ] no longer regulate swimming on the lake?
 
 
 84
 Government I'm sorry, let me make sure I understand your question, that you can swim, that there can't be lifeguards....
 
 
 85
 Q No, all I'm saying, your proposition, I very much understand the difference between a right and something that nobody stopped, but let's take swimming. You told me a minute ago that yes, indeed you could ban swimming on the lake. Presumably the reason is that same argument there never was a right to swim. Suppose the Michigan Supreme Court next week rules, it's not a new rule, it's been the rule since 1830, that you could swim on this lake, does that vaporize your right to regulate swimming?
 
 
 86
 Government Yes, that would, unless the swimming were unreasonable.
 
 
 87
 Q So in other words, this regulation can be overturned by the Michigan Supreme Court tomorrow?
 
 
 88
 Government It would be affected by decisions of the Michigan Supreme Court, of course.
 
 
 89
 Q Well, can it be overturned in the sense that your argument really rests then on valid existing rights, you say they've got these rights, this is just not one of them. Is that the guts?
 
 
 90
 Government Mm hmm.
 
 
 91
 As this exchange shows, the government, at least at times, pins its argument that Amendment No. 1 is valid on its argument that Stupak-Thrall did not have the riparian rights she claimed--Stupak-Thrall was simply claiming as "rights" activities that no one had ever stopped her from engaging in. The government's argument was therefore that the "right" claimed was not "valid." I interpret this word of the statutory phrase to address exactly the distinction that the government sought to make between an activity and/or entitlement privileged under law on the one hand, and a mere traditional usage that has simply gone unregulated, on the other. In other words, a right is "valid" if it truly exists under the source law that created it. Black's Law Dictionary defines "valid" in precisely this fashion:
 
 
 92
 Of binding force; legally sufficient or efficacious; authorized by law. Good or sufficient in point of law; efficacious; executed with the proper formalities; incapable of being rightfully overthrown or set aside; sustainable and effective in law, as distinguished from that which exists or took place in fact or appearance, but has not the requisites to enable it to be recognized and enforced by law.
 
 
 93
 Black's Law Dictionary 1390 (5th ed.1979). At oral argument, for instance, there was some concern evinced by members of the court that holding that Stupak-Thrall had valid existing rights in this case would lead to trash being dumped in Crooked Lake and the Forest Service being powerless to stop it. Such a concern is unwarranted, as the activity of dumping trash in Crooked Lake is not a "valid" right under Michigan riparian law. See Attorney Gen. ex rel. Emmons v. City of Grand Rapids, 175 Mich. 503, 141 N.W. 890, 900-01 (1913) (no riparian right to pollute waters).
 
 
 94
 Judge Moore argues in her concurrence that this construction of the phrase "valid existing rights" essentially prohibits the Forest Service from enacting any regulation that affects state-created property rights. Op. at 1270-1271. This is not the case. Compare the absolute ban in Amendment No. 1 on sailboating with a hypothetical Forest Service regulation that required sailboats operating on Crooked Lake to carry life preservers. (Of course, it is a completely separate question whether such a regulation would be a valid exercise of the Forest Service's powers under Section 4(b) of the Wilderness Act, 16 U.S.C. § 1133(b), to promote wilderness values.) Because there are no Michigan cases holding that riparians have property rights to sail without life preservers that I am aware of, this hypothetical regulation would not violate the limitation in Section 5 of the MWA because the right claimed is not "valid." I can imagine regulations that would present tricky questions about the scope of particular riparian rights under state law in connection with Section 5's limitation, but Amendment No. 1 does not raise questions of this nature, as it destroys the riparian right to sail in its entirety.
 
 
 95
 The concurrence argues that there is no basis in Michigan law for defining rights like "sailing," "fishing," "boating," "ice skating," etc., as "discrete, unconditional property 'right[s]' equivalent to a fee simple land right, instead of the plaintiffs' general right, as a whole, to use Crooked Lake in a reasonable manner." Op. at 1270 n. 5. I do not contend that either riparian rights or fee simple land rights are "unconditional." Rather, the conditions placed on both kinds of rights under state law make them indistinguishable for the purposes of this case. I am only taking Michigan's riparian rights as I find them in its case law.
 
 
 96
 Michigan law does not define riparian rights as a "general right, as a whole," Op. at 1270 n. 5, in the fashion that the concurrence would prefer that it did. There are no Michigan cases, for instance, holding that riparians have the right to sail, but that this right may be entirely destroyed, no matter how reasonably it is exercised, so long as the riparian is permitted to retain other, discrete, riparian rights. Michigan law has chosen to define its riparian rights discretely. Though Judge Moore could be right that it would be less intrusive, judged from the baseline of a discrete right to sail, to be required to wear a life preserver while sailing on Crooked Lake when compared to being prohibited from sailing entirely, judged from the baseline of a conglomerated right to use the waters of Crooked Lake for all reasonable purposes, this is beside the point. Her policy preferences are not reflected in Michigan law. Finally, the logic of the concurrence's position swallows the "concession" that "core" riparian rights, such as the right to take drinking water, could not be destroyed without violating "valid existing rights." In this circumstance, even the concurrence is conceptualizing the right to take drinking water discretely. Why would a riparian whose right to take drinking water was the only right destroyed by the government not be consoled under the concurrence's theory by the fact that she retained other "sticks" in the bundle of uses, for instance, the right to swim or fish? Presumably, the answer that the concurrence would provide is that the right to take drinking water is a so-called natural use under Michigan law and the right to sail is an artificial use subject to reasonable use regulation. But this brings me full circle--fee simple rights in land are also subject to a reasonable use limitation in the form of nuisance law, infra Section V.A., p. 1290, and that is why, to answer Judge Moore's objection, I treat the riparian rights in this case discretely, as being "equivalent to a fee simple land right."
 
 
 97
 To summarize, the plain and unambiguous meaning of "valid existing rights" in Section 5 of the MWA protects from invasion or disparagement (1) property rights (2) officially sanctioned by state law (3) in existence on the date the MWA was enacted. Applying this standard, Amendment No. 1's prohibitions on houseboats and sailboats on Crooked Lake are in excess of the Forest Service's authority under Section 5 of the MWA. Amendment No. 1's ban on the use of nonburnable, disposable food and beverage containers is not in excess of the authority the Forest Service has been delegated under Section 5 of the MWA, however. There are no cases holding that this is a "valid" riparian "right" under Michigan law. In the words of the government, using these containers may have been something no one stopped, but it is certainly not something to which there is a right under Michigan law. Therefore Amendment No. 1's regulation of the use of these containers is permissible under Chevron because this is a reasonable regulation designed to protect wilderness values. The court need not go on to decide whether Amendment No. 1's ban on nonburnable, disposable food and beverage containers was arbitrary and capricious, as Stupak-Thrall never raised such an argument on appeal.[23]
 
 
 98
 Stupak-Thrall claims to be challenging the entirety of Amendment No. 1. Yet, the entirety of Amendment No. 1 is not invalid. Moreover, as was pointed out in footnote 5, supra p. 1275, she lacks standing to make such a challenge. As then-Judge Scalia noted while sitting on the Court of Appeals for the District of Columbia Circuit, the overbreadth doctrine is in reality a rule of standing.[24] But the overbreadth doctrine does not apply outside the First Amendment context. United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). In challenges to a regulation based purely on the authorizing statute, we should hesitate to accept invitations to strike down regulations as facially invalid. Therefore, unless a plaintiff expressly disavows an "as-applied" challenge, the complaint that a regulation is invalid should be construed, if possible, as an as-applied challenge. See Jones Truck Lines, Inc. v. Cecilware Corp., Fed. Carr. Cas. p 83,951 n. 2, 1994 WL 791344 (E.D.N.Y.1994) (where it was unclear from complaint whether plaintiff was challenging statute as facially invalid or simply invalid as-applied, the presumption of validity afforded statutes counseled in favor of construing the challenge as one of the latter variety); LeBrun v. Thornburgh, 777 F.Supp. 1204, 1209 (D.N.J.1991) (Sarokin, J.) (also choosing to construe a similar challenge as an as-applied challenge); Blue Sky Entertainment, Inc. v. Town of Gardiner, 711 F.Supp. 678, 689 (N.D.N.Y.1989) (same). Therefore, especially in light of the fact that she lacks standing to bring a facial challenge, Stupak-Thrall's challenge to Amendment No. 1 should be construed as an as-applied challenge.
 
 
 99
 At this point, determining whether Stupak-Thrall's as-applied challenge to Amendment No. 1 can possibly succeed essentially requires an analysis of whether the invalid portions of Amendment No. 1 can be severed from the rest of that regulation. Section 2(g) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(13), which defines "agency action," expressly contemplates that parts of regulations can be stricken down: " 'agency action' includes the whole or part of an agency rule...." See also Section 10(e) of the APA, 5 U.S.C. § 706(2)(C), which governs the scope of our court's review in a case such as this--permitting courts to "hold unlawful and set aside agency action ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Therefore, not only does Stupak-Thrall lack standing to challenge the entirety of Amendment No. 1, the court would exceed its proper scope of review if it struck down the entirety of Amendment No. 1, "where only a part is invalid, and where the remaining portion may sensibly be given independent life." Catholic Soc. Serv. v. Shalala, 12 F.3d 1123, 1128 (D.C.Cir.1994). Therefore, Stupak-Thrall does not have a valid claim that Amendment No. 1 should be stricken in its entirety unless its bans on sailboating and houseboating on Crooked Lake are not severable from the rest of the regulation.
 
 
 100
 Severability analysis here focuses on whether the Forest Service would have enacted most of Amendment No. 1 in the absence of a sailboating and houseboating ban applied to riparian owners. See Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 506 n. 15, 105 S.Ct. 2794, 2803 n. 15, 86 L.Ed.2d 394 (1985) (focus is on hypothetical inquiry of whether statute would have been enacted without invalid provisions); Regan v. Time, 468 U.S. 641, 653, 104 S.Ct. 3262, 3269-70, 82 L.Ed.2d 487 (1984) (presumption always in favor of severability); Community for Creative Non-Violence v. Turner, 893 F.2d 1387, 1394 (D.C.Cir.1990) (Mikva, J.) (applying Brockett and Regan in the administrative regulation context). While such an inquiry is always speculative, I would conclude that in this case the Forest Service would have chosen to adopt the valid portions of Amendment No. 1. Most of Amendment No. 1 only has application to the use of wilderness land, not wilderness lakes. Amendment No. 1's ban on the use of bicycles, for instance, and the prohibition on fires except in cast iron fire rings at designated sites have no application to activities performed on lakes or to riparian rights under Michigan law. Furthermore, Crooked Lake appears to be the only lake in the Sylvania Wilderness having private riparians. There are many other lakes in the Sylvania Wilderness: Clark Lake, Johnston Springs, Whitefish Lake, Moss Lake, and Fisher Lake, to name a few. By my count, there are 31 other lakes or parts of lakes within the Sylvania Wilderness area. The Forest Service could conceivably want to protect "wilderness values" on the many other lakes within the Sylvania Wilderness area. In light of the presumption of severability, I conclude that the invalid portions of Amendment No. 1 can be severed from the valid portions. It is clearly possible for the Forest Service to permit the use of sailboats or houseboats only by riparian owners. It could simply issue identifying flags or stickers to the riparian owners should they decide to use such craft on Crooked Lake, in order to distinguish them from any public interlopers without riparian rights that the Forest Service is legitimately entitled to regulate under Section 5 of the MWA.
 
 
 101
 V. THEORIES OFFERED TO SUPPORT THE VALIDITY OF AMENDMENT NO. 1
 
 
 102
 The government has little response to a plain meaning interpretation of Section 5 of the MWA's "valid existing rights" language. It merely asserts in both its original brief to the panel and in its supplemental brief on rehearing en banc that the provision is ambiguous. No argument for why the provision is ambiguous is ever provided. But if the government is short on theories for why the statute is ambiguous, it is long on theories that purport to uphold the validity of Amendment No. 1 rooted either in the legislative history, state law, or other sources of authority. In fact, defending against the government's and the panel's theories is rather like fighting the multi-headed Lernean Hydra of Greek mythology--one argument is rebutted, but by the time the other arguments have been addressed, the head of the original argument has regenerated. It remains unclear whether any judges other than those joining in the concurrence support any one of these particular theories. I therefore do my best to explain how none of the arguments that have been offered to save the portions of Amendment No. 1 clearly outside of the Forest Service's authority under the MWA can do so.
 
 A. District Court's Reasonable Use Theory
 
 103
 The panel properly rejected the district court's argument that Amendment No. 1 is valid because of the reasonable use limitation under Michigan riparian law that prevents one riparian from using his riparian rights in an unreasonable fashion in relation to a fellow riparian. Stupak-Thrall II, 70 F.3d at 889. In fact, one of the most unfortunate aspects of this court's affirmance by default of the district court's opinion is that this is the only theory that stands with precedential value for other courts. The reasonable use limitation is analogous to nuisance law--it protects one landowner from certain incursions, for instance noxious smells, by other landowners. An even better analogy is to the common law's protection of tenants or owners from waste by co-tenants or co-owners of the property held in common. The reasonable use doctrine in riparian law protects precisely analogous interests in water usage, also held in common. The district court failed to consider the reasonable use doctrine as a species of the ancient common law maxim, sic utere tuo ut alienum non laedas--"every man must use his own property so as not to injure that of his neighbor." Hulbert, 91 N.W. at 215 (discussing the sic utere maxim in the context of riparian rights). Thompson v. Enz, the case most relied upon by the district court in its reasonable use "analysis," even adverted to Hulbert as one source of the "reasonable use" doctrine. 154 N.W.2d at 484. The "reasonable use" doctrine is thus underpinned by the sic utere maxim--they are made of the same common law "stuff."
 
 
 104
 The undertone, the unspoken assumption in both the district court's and the panel's opinion is that the reasonable use doctrine makes riparian rights somehow unique--something less than rights in land. This assumption is completely false. I suspect it could only be made by American lawyers trained in the latter half of the twentieth century. According lesser dignity to riparian rights would have been unthinkable to our predecessors, who were much better steeped in the common law.
 
 
 105
 The reasonable use doctrine is only invocable by one riparian against another riparian in his capacity as a fellow riparian and only under state law.[25] The existence of the reasonable use doctrine grants no special rights to the sovereign who happens to be a fellow riparian. In any event, the question faced in this case is what authority has been delegated to the Forest Service. The district court never explained how, even if the reasonable use doctrine did confer upon the sovereign, i.e., the United States, special rights, those rights were delegated to the Forest Service. The district court's reasonable use theory for upholding the statute is completely indefensible. The reasonable use doctrine focuses on whether a use by a fellow riparian is unreasonable, not on whether a suggested limitation on riparian rights by a sovereign is reasonable, as the district court assumed. The fact that a majority of the court could not be attracted even to reject this theory, under the same logic as the panel did, is immensely disappointing and something I cannot explain.
 
 
 106
 B. Panel's Theory of Delegation to the Forest Service of Powers Coextensive with Michigan's Police Powers
 
 
 107
 The panel ultimately concluded in this case that Section 5 of the MWA's "valid existing rights" language delegated to the Forest Service powers identical to the police powers local governments in Michigan possess to regulate the riparian rights created by Michigan law. The panel's analysis is a complete non sequitur:
 
 
 108
 [W]e find that Amendment No. 1's management prescriptions are permissible because they constitute a legitimate exercise of the sovereign's police power. The Michigan Supreme Court has explicitly held that local governments may regulate their citizens' riparian rights pursuant to their inherent police powers.... The federal government's actions here are similar to those of the townships in [the Michigan cases cited in the ellipsis] except that the "general public" in this case is the nation at large instead of the local community, and the power now comes from a highly particularized source, the Property Clause, rather than from the state's inherent powers. Kleppe [v. New Mexico, 426 U.S. 529, 540, 96 S.Ct. 2285, 2292, 49 L.Ed.2d 34 (1976) ] makes this comparison explicit: "[T]he general Government doubtless has a power over its own property analogous to the police power of the several States...."....
 
 
 109
 Thus, the Forest Service possesses a power delegated to it by Congress that is "analogous to the police power," and its exercise of this federal power does not violate Congress's express limitation deferring to "existing" state law rights in the wilderness acts, so long as it does not exceed the bounds of permissible police power regulation under state law.
 
 
 110
 Stupak-Thrall II, 70 F.3d at 889-90 (emphasis supplied and citations omitted). How does this conclusion follow from its premise? The "logic" is contorted and completely circular. In its impact, it is difficult to distinguish from the district court's reasonable use theory. The fact that Kleppe noticed an analogy to be made between the authority of the federal government (read Congress) under the Property Clause to regulate its own property (and private property where necessary and proper) and the states' police powers to regulate their citizens' property is absolutely irrelevant to the determination of whether Congress has delegated its powers to the Forest Service in the MWA. It simply does not follow that the Forest Service possesses the Congress's Property Clause powers because these powers were once analogized by the Supreme Court to the states' police powers.[26]
 
 
 111
 Moreover, it takes a further giant leap in the panel's analysis to reach the conclusion that Congress delegated powers to the Forest Service identical to those possessed by Michigan's local governments. The panel could not possibly explain how the language Congress chose in Section 5 of the MWA would support any implication that the delegation of power in that provision was designed with reference to Michigan's police powers, let alone Michigan's police powers as they are typically delegated under Michigan law to its local governments.
 
 
 112
 If Congress had intended to convey such broad-ranging powers, it could have spoken much more clearly. For instance, in addition to the "valid existing rights" language in Section 5 of the MWA, Congress could have included a provision such as this: "Such valid existing rights can be regulated by the Forest Service with the full panoply of police powers possessed by local governments in the State of Michigan relating to such rights." Section 5 of the MWA is completely silent on the subject of state or local police powers. Indeed, why would Congress, if Kleppe confirms that its powers over its own property are completely analogous to those of the several states, need to delegate powers coterminous with the police powers of Michigan's local governments to the Forest Service? This adds an unnecessary layer of legal complexity. Why not simply cut out the middle-man and provide that any "valid existing rights" could be regulated by the Forest Service as Congress could regulate them under the Property Clause? Application of an Occam's razor-like principle to interpretation of the MWA suggests that the panel's interpretation is illogical.
 
 
 113
 But to think about how Congress might have phrased a delegation of police powers of any sort is to think about why Congress would want to delegate the full range of any set of police powers and still include a limitation like "valid existing rights." The answer to that question is obvious: Congress would not want simultaneously to delegate a full range of police powers and to limit the Forest Service to regulations that did not impinge on "valid existing rights." One of the major functions of police powers is to impinge upon property rights. Although it was not always thus, in the modern legal world, except with reference to constitutional limits, a state's police power is virtually unlimited, if not completely so. This is true under federal or Michigan law. See Maher v. City of New Orleans, 516 F.2d 1051, 1059 (5th Cir.1975) ("The Supreme Court has made it clear that, while the police power is not unlimited, its boundaries are both ample and protean."); Hazel Park Racing Ass'n v. Inglis, 343 Mich. 1, 71 N.W.2d 692, 696-97 (1955) (Smith, J., dissenting) (" 'The police power is broad and sweeping, inherent in sovereignty and, except as restricted by constitutional authority, or natural right ... in effect, is unlimited.' ") (quoting State ex rel. Morris v. West Virginia Racing Comm'n, 133 W.Va. 179, 55 S.E.2d 263, 270 (1949)). Under Michigan's police power, the state can demolish your house or burn it to prevent the spread of plague or rectify any problem harmful to the public's health, safety, or morals. Orion Charter Township v. Burnac Corp., 171 Mich.App. 450, 431 N.W.2d 225, 230 (1988) (demolition); Clinton v. Spencer, 250 Mich. 135, 229 N.W. 609, 615 (1930) (plague). To delegate federal power identical to this state power is to impose no limitations on the Forest Service at all. Yet, the "subject to valid existing rights" language in Section 5 of the MWA is obviously intended to be a limitation. Under the panel's police power delegation theory, this limitation is rendered a nullity. The panel's resolution of this case therefore violates the cardinal rule of statutory construction: to save and not destroy. United States v. Bazel, 80 F.3d 1140, 1144 (6th Cir.1996) (citing United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 519-20, 99 L.Ed. 615 (1955) (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 620-21, 81 L.Ed. 893 (1937))).
 
 
 114
 The interpretation of the "valid existing rights" language in Section 5 of the MWA to mean that Stupak-Thrall has no rights that the Forest Service is bound to respect is a good example of the distortion of language decried by George Orwell in his famous essay, Politics and the English Language:
 
 
 115
 In our time, political speech and writing are largely the defence of the indefensible.... Thus political language has to consist largely of euphemism, question-begging and sheer cloudy vagueness. Defenceless villages are bombarded from the air, the inhabitants driven out into the countryside, the cattle machine-gunned, the huts set on fire with incendiary bullets: this is called pacification. Millions of peasants are robbed of their farms and sent trudging along the roads with no more than they can carry: this is called transfer of population or rectification of frontiers ....
 
 
 116
 A mass of a Latin words falls upon the facts like soft snow, blurring the outlines and covering up all the details.
 
 
 117
 George Orwell, Politics and the English Language, in 4 The Collected Essays, Journalism and Letters of George Orwell 136-37 (Sonia Orwell and Ian Angus eds., 1968). The panel's interpretation of the phrase "valid existing rights" renders that term completely meaningless.
 
 
 118
 The panel's opinion (as well as the other theories proposed to support the validity of Amendment No. 1) also destroys the benefit of the legislative bargain inherent in the "valid existing rights" phrase, and gives less politically accountable administrative agencies the power to make regulations infringing upon or destroying existing state property rights contrary to Congress's intent. It removes from Congress's hands a powerful tool to modulate the amount of power it chooses to delegate to administrative agencies. Since we know that State police powers are very broad, the panel's interpretation of "valid existing rights" makes this intended protective reservation of power, which is usually a very hard-fought part of any new federal land classification or regulation, meaningless or even harmful to property owners. Recall the letter to Congressman Robert Davis from local Forest Supervisor, Dave Morton, who opined that, "without the original Congressional compromise of accepting established pre-existing valid right of motorized use on Crooked, Big Bateau, and Devils Head lakes, we feel that we would not have a Sylvania Wilderness today."[27] While this statement does not have the status of official legislative history (such as committee reports and floor debates), and it is dubious to consult legislative history in this case as I explain below, it is an important admission from a representative of the Forest Service, having the qualities of a statement against interest. Morton's letter only establishes what should be obvious to those who understand environmental legislation and the compromises attendant upon such laws and to those who think seriously about the purposes behind including a "valid existing rights" limitation on the Forest Service's powers.
 
 
 119
 Once one recognizes that the panel's interpretation of the "valid existing rights" phrase renders meaningless what was intended to be a limitation, then circuit precedent in other areas is threatened if this theory is ever applied to "valid existing rights" language as used in other statutes through the method of statutory interpretation called in pari materia--interpreting like provisions in different statutes to have the same meaning. See Belville Mining v. United States, 999 F.2d 989, 992 (6th Cir.1993) (accepting that "valid existing rights" language in the Surface Mining Control and Reclamation Act (SMCRA) prevented the prohibition of mining by the Department of the Interior if deeds for the relevant tracts had clearly reserved under state law the right to mine by strip mining methods). If the panel's interpretation of "valid existing rights" were extended to SMCRA, Belville would be vitiated because there would have been a strong argument in Belville that Ohio could have used its police powers to prohibit or limit strip mining in light of various health and safety concerns, for instance, those associated with subsidence. By contrast, the nuisance aspects of the activities regulated by the Forest Service in this case are minimal--strip mining is many orders of magnitude more threatening to the environment than using sailboats or houseboats on Crooked Lake. No state property right protected by a "valid existing rights" savings clause would ever be safe from the panel's police power theory.
 
 
 120
 Belville and this case cannot be distinguished. Both riparian rights and contract rights are subject to a state's police powers. A state could curtail the right to sail on Crooked Lake just as it could the right to engage in strip mining reserved in a contract as in Belville. Thus, if Stupak-Thrall had been decided before Belville, the Office of Surface Mining could easily have claimed that because the State of Ohio could prohibit strip mining outright if it chose under delegated local police powers, then it, the Office of Surface Mining, could abrogate any contractual right to engage in strip mining without running afoul of Congress's "valid existing rights" language in SMCRA by use of the in pari materia method of statutory interpretation.
 
 
 121
 While there may exist a plausible reading of the "valid existing rights" language in Section 5 of the MWA more limited than my own (although I cannot think of one), the theory concocted by the panel is strained and unnatural. In my view, its interpretation of Section 5 of the MWA constitutes an utterly illegitimate judicial annotation of the text of the statute.
 
 
 122
 C. Chief Forester's and Government's New Takings Theory
 
 
 123
 Perhaps sensing the weakness in the panel's argument, the government suddenly advanced a new theory in its supplemental brief on rehearing en banc to defend the validity of Amendment No. 1, a theory first espoused by the Chief Forester in his original opinion ruling on Stupak-Thrall's administrative appeal. In its supplemental brief, the government claimed that the term "valid existing rights" in the MWA is coextensive with the rights protected by the Takings Clause of the Fifth Amendment.[28] In other words, this court should determine whether Amendment No.1 is a regulatory taking and then uphold it as violating no valid right under Section 5 of the MWA if such a taking has not occurred. This takings-based reading of Section 5 of the MWA is even weirder and more strained than that devised by the panel, if that is possible, and it should be rejected for a number of reasons.
 
 
 124
 First, there is absolutely no support for interpreting the statute in this way on the basis of its text. Section 5 of the MWA does not define "valid existing rights" as the right to be free of a taking within the meaning of the Fifth Amendment. The legislative history never mentions takings analysis in connection with the "valid existing rights" phrase, either. For this reason, interpreting Section 5 of the MWA to be coextensive with the Takings Clause creates a new specious canon of statutory construction--the canon of charging headlong, willy-nilly into constitutional questions. Of course, the correct canon of statutory interpretation to apply in this situation is the canon to avoid constitutional questions, whenever fairly possible. United States v. X-Citement Video, Inc., --- U.S. ----, ----, 115 S.Ct. 464, 467, 130 L.Ed.2d 372 (1994); Eubanks v. Wilkinson, 937 F.2d 1118, 1122 (6th Cir.1991) (Merritt, C.J.) ("Courts construe statutes to avoid constitutional difficulty when 'fairly possible.' ") Here, not only is it fairly possible to avoid a constitutional question, but there is absolutely no reason to embrace the constitutional question, as the takings theory of Section 5 of the MWA does. Therefore, the court cannot interpret Section 5 of the MWA in such a fashion. This theory must be rejected.
 
 
 125
 Second, to support his takings interpretation of the "valid existing rights" language in the MWA, the Chief Forester cited two cases, both of which involved the Federal Land Policy and Management Act of 1976 ("FLPMA"). One of them, Sierra Club v. Hodel, 675 F.Supp. 594 (D.Utah 1987), aff'd in part, rev'd in part, 848 F.2d 1068 (10th Cir.1988), never mentions the word "takings," let alone construes "valid existing rights" as used in the FLPMA to require the application of takings analysis. The other, Utah v. Andrus, 486 F.Supp. 995, 1010 (D.Utah 1979), does construe the phrase "valid existing rights" in this fashion, but predates Chevron and provides no independent analysis of either FLPMA or its legislative history.[29] In fact, the Andrus district court chose to rely, without giving any reasons, on an opinion to this effect by the Solicitor of the Department of the Interior. This Solicitor's Opinion is highly conclusory. The Opinion merely assumes that the "valid existing rights" phrase was intended to deny to the Secretary of the Interior the power to engage in takings:
 
 
 126
 "Valid Existing Rights." Sec. 701(h) of FLPMA, 43 U.S.C.A. § 1701(h) (West Supp.1978), states that, "All actions by the Secretary concerned under this Act shall be subject to valid existing rights." Mineral leases, mining claims and grazing permits all grant varying rights and privileges and these rights and privileges cannot be taken pursuant to sec. 603 or any other section of FLPMA. The degree to which sec. 603 authorizes regulation of valid existing rights to protect wilderness suitability is thus bounded by the fact that these rights must not be condemned or taken.
 
 
 127
 The degree to which FLPMA allows regulation of the exercise of these rights and privileges without "taking" them in the constitutional sense is a complex one which can be addressed only in concrete cases.
 
 
 128
 Interpretation of Section 603 of the Federal Land Policy and Management Act of 1976--Bureau of Land Management (BLM) Wilderness Study, 86 Int. Dec. 89, 116 (1978). The Solicitor's Opinion never seriously asked the question of how the "valid existing rights" provision in the FPLMA should be interpreted. It simply reached a conclusion. At oral argument, the government indicated that it thought the Chief Forester's opinion that the "valid existing rights" language in the MWA should be construed as coextensive with the Takings Clause was correct. I fail to see what possible basis there is for agreeing with the government or the Chief Forester about the meaning of Section 5 of the MWA's "valid existing rights" language in light of the paltry and opaque authority cited to support this position. The authority cited involved a different statute with a different legislative history being interpreted by a different administrative agency and was explicitly adopted in only one district court case on the basis of no express reasoning. The concurrence also seeks to rely on authorities that address the "valid existing rights" phrase in statutes other than the MWA, such as Andrus and the Solicitor's Opinion. However, since the concurrence eschews the plain meaning approach to interpreting the "valid existing rights" phrase, it logically should delve deeply into the different legislative histories and statutory structures of these very different enactments. This is something the concurrence does not do. See Section V.F., pp. 1302-1305 infra.
 
 
 129
 Moreover, the constitutional question that would thus be imported into this case is exceedingly difficult. Answering it depends on resolving the vexing matter of how to define the "denominator" of the entitlement for regulatory takings analysis. Precisely this question was left open in the famous footnote 7 of Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1016 n. 7, 112 S.Ct. 2886, 2894 n. 7, 120 L.Ed.2d 798 (1992).[30] (Lucas established the rule in regulatory takings doctrine that a 100% taking of an entitlement was always compensable as a taking.) See generally John E. Fee, Comment, Unearthing the Denominator in Regulatory Takings Claims, 61 U. Chi. L.Rev. 1535 (1994). The Court's footnote states, in relevant part:
 
 
 130
 Regrettably, the rhetorical force of our "deprivation of all economically feasible use" rule is greater than its precision, since the rule does not make clear the "property interest" against which the loss of value is to be measured. When, for example, a regulation requires a developer to leave 90% of a tract in its rural state, it is unclear whether we would analyze the situation as one in which the owner has been deprived of all economically beneficial use of the burdened portion of the tract, or as one in which the owner has suffered a mere diminution of value of the tract as a whole. (For an extreme--and, we think, unsupportable--view of the relevant calculus, see Penn Central Transp. Co. v. New York City [438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)] ....) Unsurprisingly, this uncertainty regarding the composition of the denominator in our "deprivation" fraction has produced inconsistent pronouncements by the Court. The answer to this difficult question may lie in how the owner's reasonable expectations have been shaped by the State's law of property--i.e., whether and to what degree the State's law has accorded legal recognition and protection to the particular interest in land with respect to which a takings claimant alleges a diminution in (or elimination of) value.
 
 
 131
 Lucas, 505 U.S. at 1016 n. 7, 112 S.Ct. at 2894 n. 7 (emphasis supplied).
 
 
 132
 I would not venture an answer to this question in a run-of-the mill takings case if it were fairly possible to avoid doing so. In this case, there is even more reason to avoid the constitutional takings question, especially because the need to answer such a question would stem purely from a completely unsupportable reading of Section 5 of the MWA.[31]
 
 
 133
 D. Theory That Claimed Riparian Rights Are Nonexistent or Too Insubstantial under Michigan Law
 
 
 134
 As I have indicated, one of the underlying assumptions in the district court's and the panel's opinions appeared to be that riparian rights were somehow lesser creatures, diminutive rights, if rights at all. The government, at oral argument, was also quick to capitalize on this impression:
 
 
 135
 [Riparian rights are] property right[s], but they are usufructuary ... and I think it's clear with many such rights under the common law all such usufructuary rights, water rights, rights to appropriate water, rights to use water for beneficial use out west, have always been subject to a lot of regulation. Common law about riparian rights has always recognized that these are rights you use with other people and as a result your right to use can be restricted.
 
 
 136
 This statement may be technically correct, but it leaves one with the incorrect impression that riparian rights are more insubstantial, and deserving of less protection, than rights in land. Riparian rights are subject to no more regulation in Michigan than land rights. Riparian rights are property rights.[32] And these property rights include the right to boat, canoe, fish, fowl, sail, swim, water ski, ice skate, sled, engage in other aquatic sports, bathe, take water for domestic use, agricultural use, or use in the arts, cut and take ice, wade, and wash vehicles and clothing--all on the entirety of the relevant lake. Many cases even indicate that this list is only meant to be illustrative.[33] There are even Michigan cases holding that certain actions taken by the State of Michigan or its local governments constituted takings of riparian rights.[34]
 
 
 137
 Riparian rights are subject to the police power and so are rights exclusively in land. Riparian rights are subject to a reasonable use limitation in order to protect other riparian rights holders. But so are fee simple land rights subject to a reasonable use limitation in the form of nuisance law. An even better analogy than one to the law of nuisance can be drawn to the common law protection afforded to co-owners or co-tenants of land against waste by their fellow owners or tenants. It seems to me that the fact that riparian rights are held in common or subject to a reasonable use limitation under state law does not diminish their status as property rights. Riparian rights are not diaphanous rights, mini-rights, junior varsity rights or quasi-rights. They exist under state law on the same level as pure rights in land. Riparian rights come within the protection of Section 5 of the MWA's "valid existing rights" language. They are not entitled to less protection under MWA because of a mistaken impression that they are less significant than rights in land.
 
 
 138
 The government's focus in its briefs on the distinction between natural and artificial uses also does not carry the day for Amendment No. 1. See Thompson v. Enz, 154 N.W.2d at 483. Artificial uses do not become non-rights under Michigan riparian law. The only significance of the natural/artificial distinction is that the latter sort of riparian rights are subject to the reasonable use limitation and the natural uses are not.[35] Ibid. Given that all rights in land, especially common tenancies, are subject to reasonable use limitations in the forms of doctrines regulating nuisance and waste, the fact that there is a category of riparian rights that cannot be so regulated could be said to establish that riparian rights should be afforded greater dignity as a whole than rights in land, not less.
 
 
 139
 Most of the government's arguments from state law seem designed to confuse. Others are simply ridiculous. Consider the government's argument that the "valid existing rights" language in Section 5 of the MWA would prevent the Forest Service from denying Stupak-Thrall access to Crooked Lake. At oral argument, however, the government admitted that under its various theories and the panel's local police power theory, the Forest Service would have the ability to stop Stupak-Thrall from using almost every conceivable form of locomotion to implement that access: swimming, motorboating, sailing, and ice skating, among others. Only walking on water was not addressed, and the number of practitioners of that particular mode of access is very small. The government's arguments from state law are designed to give the impression that something remains of the protection afforded by the "valid existing rights" limitation and consequently something remains of state riparian rights, but in reality, under its theories, no such protections or rights remain. Michigan state law provides absolutely no support for Amendment No. 1.
 
 
 140
 E. Legislative History and the Motorboat Theory
 
 
 141
 Before delving into what light the legislative history of the MWA and Wilderness Act can shed on the controversy involved in this case, it is first necessary to ask whether this court can consult the legislative history at all. Honestly facing up to this question yields a negative answer. When the text of a statute is clear, courts cannot look to legislative history to create ambiguity. Audette v. Sullivan, 19 F.3d 254, 256 (6th Cir.1994); Covill v. United States, 959 F.2d 58, 61 (6th Cir.1992); United States v. Ransbottom, 914 F.2d 743, 745-46 (6th Cir.) (Brown, J.), cert., denied, 498 U.S. 971, 111 S.Ct. 439, 112 L.Ed.2d 422 (1990). While Chevron itself considered legislative history, it is important to realize that the Chevron rule on the consideration of legislative history is unidirectional--it permits legislative history to be considered only to establish that Congress's intentions on a particular point are clear, not to create ambiguity in an otherwise clear statute. See Chevron, 467 U.S. at 845, 104 S.Ct. at 2783 (quoting United States v. Shimer, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)):
 
 
 142
 If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.
 
 
 143
 See also Chevron, 467 U.S. at 862, 104 S.Ct. at 2791 (concluding legislative history related to relevant statute "unilluminating"). If this were not true, then the Supreme Court would be contradicting itself when it says, "we do not resort to legislative history to cloud a statutory text that is clear." Ratzlaf v. United States, 510 U.S. 135, ----, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994) (Ginsburg, J.). Reading Chevron as a unidirectional rule is the only way to harmonize Chevron with the Supreme Court's other, fairly standard, pronouncements on statutory interpretation. The government's attempt to use legislative history is thus contrary to the Supreme Court's directives on the proper use of legislative history in statutory interpretation as set out in cases like Ratzlaf.
 
 
 144
 But, putting aside my argument that the legislative history cannot be consulted here, I also maintain that no damage to my analysis and conclusions is actually done by consulting the legislative history in this case. The government's arguments from the legislative history of the Wilderness Act and the MWA make a general logical error that I will call the "fallacy of exclusivity," or the "exclusivity fallacy" for short--because "valid existing rights" are mentioned with regard to only one kind of right in the legislative history, Congress intended only that sort of right to be protected.
 
 
 145
 The government's lead-off argument from the legislative history provides the classic example of an "exclusivity fallacy." See, e.g., H.R. Rep. 29, 100th Cong., 1st Sess., pt. 1, at 5 (1987) [hereinafter "Committee on Interior and Insular Affairs Report"][36] ("In designating the Nordhouse Dunes area as wilderness, the Committee is mindful that some two-thirds of the area is underlain by privately owned mineral rights.") Therefore, the proper interpretation of the "valid existing rights" language is elementary, argues the government--Congress was concerned only about "valid existing rights" in the Nordhouse Dunes wilderness area. And even if it was concerned about "valid existing rights" in other wilderness areas, such as the Sylvania Wilderness, it was only concerned with mineral rights. Riparian rights are not mineral rights and therefore should not be protected from Forest Service regulation. Quod erat demonstrandum. There is no necessary reason to read the legislative history in this way, however. While it could easily be read to show an especial concern with mineral rights, it most certainly does not prove that Congress intended to protect only mineral rights. Thus, the government's argument must be rejected as a logical matter. Indeed, the district court rejected it, and the panel properly noted that the government has waived the ability to challenge the district court's rejection of its Nordhouse Dunes legislative history argument by failing to cross-appeal. Stupak-Thrall II, 70 F.3d at 884 n. 4. The district court was correct in rejecting this blatant attempt to manipulate the legislative history. In the words of the district court, "The 'valid existing rights' clause in the MWA is a simple, straightforward savings clause that is not limited to a particular kind of right." Stupak-Thrall I, 843 F.Supp. at 330.
 
 
 146
 At oral argument the government advanced a second claim based on the legislative history--that the "valid existing rights" language is simply meaningless:
 
 
 147
 Government .... And if you look at the legislative history to the Michigan Wilderness Act, Congress says in its committee report we have no idea what this ["valid existing rights" language] means. We have no idea. And that means that the term is ambiguous and you let the agencies construe it. I think here the agencies have construed it reasonably. You have to balance the interests that the plaintiffs had against what Congress has....
 
 
 148
 Q Is that constitutional for Congress to pass an act that has no meaning at all to Congress?
 
 
 149
 [LAUGHTER]
 
 
 150
 Government Well, as I like to say, your Honor, the arbitrary and capricious test does not apply to acts of Congress, it only applies to the actions of administrative agencies and if they want to pass....
 
 
 151
 Q No, my question is a serious one.
 
 
 152
 Government I think that, I think that here the Forest Service has given it meaning. I mean, it certainly isn't a violation of the nondelegation doctrine or anything like that. The agency has given it meaning and it is a meaning that is a reasonable one and comports with other interpretations of the term as other agencies have done it....
 
 
 153
 Presumably the part of the legislative history referred to by the government is the following passage, which occurs immediately after the Nordhouse Dunes passage discussed above, p. 1299:
 
 
 154
 What rights may constitute "valid existing rights" is a question of law which the Committee does not attempt to define. The extent of the nonfederally-owned mineral rights are determined in part by the terms of the deeds which the owners acquired the rights, and by federal, state and local laws and regulations. The inclusion in the bill of language relating to valid existing rights should not be construed as reflecting any express or implied determination by the Committee regarding the nature or extent of the title to such rights.
 
 
 155
 Committee on Interior and Insular Affairs Report at 5-6.
 
 
 156
 First, I think the government's argument that Congress indicated that it thought that the "valid existing rights" language in Section 5 of the MWA is meaningless is simply wrong. Belville Mining actually sheds some light on what Congress had in mind. Under the laws of many states, including Ohio, the relevant state in Belville Mining, a deed or lease for mineral rights does not confer the right to mine by strip mining methods. The deed or lease must specifically contemplate in some fashion that the minerals owned or leased can be mined by strip mining methods. It seems to me that all the quoted passage in the committee report indicates is that Congress was aware of this background principle of state law. In other words, the quoted language in the committee report was included to ensure that the holder of a mineral lease or deed could not attempt to claim that he had rights that were protected by Congress in Section 5 of the MWA not protected under state law. The fact that a statute or report looks to preexisting law for the meaning of a term hardly implies that that definition was meant to be infinitely malleable.
 
 
 157
 Second, even if this passage were read in the fashion the government has read it, as indicating that Section 5 of the MWA is meaningless, then obvious constitutional difficulties arise. The non-delegation doctrine may be largely dead, or barely breathing, but it is not totally dead. Congress could not enact the text of Joyce's Finnegan's Wake and then delegate to the Forest Service the power to administer it. If the text of a statute were truly meaningless, doubtless even the post-New Deal Supreme Court would find non-delegation problems with such a statute. To concede that a statutory provision is meaningless is to concede exactly what concerned Justice Cardozo, hardly one of the Four Horsemen, when he said: "The delegated power of legislation which has found expression in this code is not canalized within the banks that keep it from overflowing. It is unconfined and vagrant, if I may borrow my own words in an earlier opinion." Schechter Poultry Corp. v. United States, 295 U.S. 495, 551, 55 S.Ct. 837, 852, 79 L.Ed. 1570 (1935) (Cardozo, J., concurring) (citing Panama Refining Co. v. Ryan, 293 U.S. 388, 440, 55 S.Ct. 241, 256-57, 79 L.Ed. 446 (1935)). But, as I have stated, the "valid existing rights" phrase is far from meaningless and was not thought to be meaningless by Congress, so there is no need for our court to reach such extreme constitutional questions as the government brought to the surface in this case at oral argument.
 
 
 158
 Third, the government points to a passage where the Committee on Interior and Insular Affairs stated, "the committee believes that any proposed exploration and/or development of the underlying mineral rights should be carefully examined by the Forest Service to insure that disturbances to the wilderness are minimized under applicable law." Committee on Interior and Insular Affairs Report at 6. From this language, the government argues that Congress intended to grant the Forest Service powers to regulate mining despite the "valid existing rights" limitation in Section 5 of the MWA. This passage does not support such a view, however. There is nothing inconsistent between the Forest Service attempting to minimize the damage done by mining where such a right exists, and its recognizing the existence of such a right. In fact, if there were no right to mine, then there would be no reason to advise the Forest Service to minimize damage from mining; mining could simply be prohibited outright. Moreover, the government appears to have excerpted this passage very deliberately. Immediately after the quoted language, the committee tells the Forest Service what kinds of options it should consider in attempting to minimize damage to wilderness areas. These include purchasing or exchanging the mineral rights, using fringe or slant drilling, providing special roads, and coordinating with state and local authorities. Committee on Interior and Insular Affairs Report at 6-7. What is significant is that at no point does the committee say, "But, if the Forest Service deems it impossible to protect a wilderness area adequately after pursuing these mitigation strategies, it can simply ban mining outright or regulate it." The government's argument from this piece of legislative history is therefore also misleading and incorrect.
 
 
 159
 Finally, the government points to a passage from the legislative history concerning motorboat usage:
 
 
 160
 In designating this area as wilderness, the Committee is aware that motorboats are currently used for fishing and other purposes on Big Bateau, Devils Head and Crooked Lakes. In accordance with section 4(d)(1) of the Wilderness Act, such pre-existing motorboat use may be permitted to continue on the 3 lakes subject to such restrictions (motor horsepower limits, levels of use, etc.) as the Forest Service deems appropriate and desirable. It is the Committee's understanding that the issue of motorboat use is currently being reviewed in the land management planning process for the Ottawa National Forest, and that future use will be guided by the plan.
 
 
 161
 Committee on Interior and Insular Affairs Report at 7. This piece of evidence from the committee report provides the government its strongest argument from the legislative history, but it is still unavailing. As described in Section I, at pages 1272-73, the MWA incorporates the Wilderness Act. Indeed, Section 4(d)(1) of the Wilderness Act does specifically provide that the continued use of motorboats within wilderness areas is discretionary with the Secretary of Agriculture. Thus, the report is correct as far as it goes, which is not very far. The government argues that because boating is a riparian right under Michigan law and this activity can still be regulated pursuant to Section 4(d)(1) of the Wilderness Act, therefore riparian rights are not protected by the MWA. This argument collapses, however, because the committee was not discussing "valid existing rights" at the time it made this pronouncement. The quoted passage occurs in a series of wilderness-area-by-wilderness area discussions in the committee report. There is an obvious way to interpret this passage without impinging upon the broad language of Section 5 of the MWA that protects all sorts of rights. Recall that the Forest Service built the first public boat landing on Crooked Lake. This passage in the legislative history could be read to acknowledge what is obvious from Section 5 of the MWA's incorporation of the whole of the Wilderness Act, including Section 4(d)(1)--that the Forest Service, as an arm of the Department of Agriculture, had the authority to regulate the motorboat usage of non-riparians. Indeed, it must be read this way, otherwise the clearly expansive word "rights" in Section 5 of the MWA is read arbitrarily to exclude riparian rights. Finally, the last sentence of the quoted legislative history is simply boilerplate as to what bureaucratic process will occur. It is not related to the substantive outcome of the administrative review being conducted.
 
 
 162
 The government must be given its due by recognizing that the legislative history never specifically acknowledges that riparian rights are protected by the "valid existing rights" language. Thus, it is perhaps safe to assume that the members of Congress involved in writing the relevant committee report (to the extent the report was written by members of Congress and not their staffers) did not think about riparian rights. However, it is clear that members of Congress did think about mining rights and contemplate that these should be included in the protection from regulation offered by the savings clause in Section 5 of the MWA. When Congress decides to act at a higher level of generality to remedy a set of problems than the specific examples it expressly contemplates in the legislative history of an enactment, courts must enforce the statutory provisions at that level of generality and cannot limit the application of the statute to the specific examples given in the legislative history merely because they or the relevant administrative agencies think that such a limitation would constitute good policy. This is an improper use of legislative history, especially where the legislative history can be given more plausible readings consistent with the level of generality to which the text of the statute is pitched.
 
 
 163
 The legislative history should not be consulted in this case because Section 5 of the MWA is clear. Legislative history cannot be consulted, even under Chevron, to contradict unambiguous text. Even "peeking" at the legislative history, however, yields nothing that defeats my interpretation of the "valid existing rights" language in the MWA.
 
 
 164
 F. The "Takings Plus" Theory in the Concurrence
 
 
 165
 In her concurrence with our order en banc, Judge Moore presents another takings-based theory to defend the validity of Amendment No. 1. She calls this theory "takings plus." Op. at 1271. Though she describes it as a "slight clarification" of the panel's opinion, Op. at 1271, I do not see how the panel's opinion could possibly have been interpreted as relying on takings analysis. The panel never even mentioned the word "takings" except in its initial description of Stupak-Thrall's takings claim being dismissed without prejudice by the district court. The concurrence also asserts that it would not be fairly possible to avoid the takings question in this case. Ibid. But the panel and the district court seem to have done an excellent job of avoiding this question. If it is so clear that the statutory language requires the application of a takings analysis, one would have thought that the judges who wrestled with this issue earlier would have done so. Both the argument that the constitutional takings question is not fairly avoidable in this case and the argument that the concurrence is a slight modification on the panel's theory cannot withstand scrutiny.
 
 
 166
 Had it not been for the concurrence, one would not have known that any members of the panel had devoted thought to the application of Chevron or that the panel had held that the "valid existing rights" phrase was ambiguous, because the panel's opinion never cited the case or applied its two-part approach to determine the validity of Amendment No. 1.
 
 
 167
 Judge Moore claims that "all authorities" support the conclusion that the phrase "valid existing rights" is ambiguous and that the phrase invokes takings analysis. Op. at 1269-1270. To the extent the concurrence relies on authorities such as Andrus and the Solicitor of the Interior's opinion, I have refuted it above. See Section V.C., supra, pp. 1294-1295. New arguments to support the ambiguity of "valid existing rights" or "subject to valid existing rights" are also provided by the concurrence, however.
 
 
 168
 First, Judge Moore tells us that the phrase "valid existing rights" must be ambiguous because "The University of Kentucky ... has devoted an entire 375-page issue to trying to untangle the phrase." Op. at 1270 n. 3. Thankfully, we have not yet reached the stage where law review articles rather than Article III judges determine when ambiguity is present in a provision of law. Law review commentators, especially those of the "critical legal studies" school, are notorious for thinking every bit of text is ambiguous. See, e.g., Anthony D'Amato, Aspects of Deconstruction: The "Easy Case" of the Under-Aged President, 84 Nw. U.L.Rev. 250 (1989) (arguing that the constitutional requirement that President of the United States be at least 35 years of age is ambiguous). By my count, the articles containing arguments that this provision in the Constitution is ambiguous total at least 308 pages.[37] If one adds the articles arguing that the provision is unambiguous, then the total number of pages attempting to "ambiguate" or to "dis-ambiguate" this phrase reaches at least 682.[38]
 
 
 169
 Also consider that one of the articles in the symposium relied on by Judge Moore, not surprisingly the shortest, essentially argues that the phrase "valid existing rights" is unambiguous and that a takings-based interpretation of the phrase suffers from various infirmities. Ernest C. Baynard, III, Establishing a Definition of Valid Existing Rights, as Used in Section 522(e) of SMCRA, 5 J. Min. L. & Pol'y 529-36 (1989-90). Most significantly, Baynard points out that the takings-based interpretation creates a paradox:
 
 
 170
 [W]hen is a taking not a taking? Simply put, in order for the taking of private property by an officer of United States to be compensable under the Fifth Amendment, i.e., in order for a taking to be a Fifth Amendment taking, it must be authorized expressly, or by necessary implication by an act of Congress. Thus, if action taken by the [regulatory authority] is beyond the authority conferred by Congress, such action probably could not be a compensable taking.... So long as the action taken was beyond the scope of authority conferred by Congress, no Fifth Amendment taking would occur and the "takings" definition of [valid existing rights] would presumably not be triggered.
 
 
 171
 Id. at 532-33 (footnotes omitted). Of course, the simplest way out of this paradox is to relax the usual requirement that a regulatory action be authorized by Congress in order to be a taking for the purposes of interpreting "valid existing rights." This added layer of complexity provides yet another reason why the takings-based approach to interpreting "valid existing rights" is strained and unnatural.
 
 
 172
 The symposium Judge Moore relies upon primarily focused on "valid existing rights" in SMCRA. Again, SMCRA is a different statute with a different legislative history being administered by a different regulatory agency than the Forest Service. SMCRA's legislative history, unlike the legislative history of the MWA, does show that Congress wanted to avoid takings. See, e.g., 123 Cong. Rec. H12,878 (1977), cited in Meridian Land and Mineral Co. v. Hodel, 843 F.2d 340, 346-47 (9th Cir.1988). However, the plain meaning interpretation of "valid existing rights" satisfies this aim, as well; it avoids takings, as any "taking" of valid existing rights would be beyond the statutory authorization of the Forest Service. The legislative history of SMCRA does not establish that "valid existing rights" should be interpreted as coextensive with the Takings Clause, however. To attempt to bootstrap a congressional concern to avoid takings into a construction of "valid existing rights" that specifically invokes takings analysis, however, is to commit the exclusivity fallacy discussed at length above, pp. 1298-1299. The District of Columbia Circuit specifically avoided the exclusivity fallacy in National Wildlife Fed'n v. Hodel, 839 F.2d 694, 750 (D.C.Cir.1988), when it noted that the legislative history of SMCRA "suggest[ed] that Congress did not intend to infringe on valid property rights or effect takings...." (Emphasis supplied).
 
 
 173
 Second, Judge Moore argues that because our court is evenly divided the provision must be ambiguous. Op. at 1270 n. 3. This argument is completely circular and provides no independent basis to support the validity of Amendment No. 1. Otherwise, on questions of statutory or regulatory ambiguity, the court would be ruled by the vote of a single judge. Surely, even ample respect for our colleagues does not make the views of one or more judges conclusive on the legal question of ambiguity. Cf. Americans United for Separation of Church and State v. City of Grand Rapids, No. 90-2337, 1992 WL 77643, at * 21 (6th Cir. April 21, 1992) (Boggs, J., dissenting) ("reasonable observer" test in the First Amendment Establishment Clause context is a special legal creature not based on the subjective reactions of individual judges), vacated, (6th Cir. June 25, 1992). Neither the page-counting nor evenly-divided court arguments provide any basis for refuting my straightforward analysis of the "valid existing rights" phrase. Like the government, the concurrence does little more than assert that ambiguity exists without providing any real argumentation to buttress this conclusion.
 
 
 174
 The "taking plus" theory also has no support in the text or legislative history of the MWA, and was certainly not inherent in the panel's opinion. The "takings plus" theory moves another large step away from any sensible reading of Section 5 of the MWA. While there is one case adopting the takings theory alone, Andrus, there are no cases adopting a "takings plus" theory. Of course, this fact alone does not carry much weight because courts often face issues of first impression. I would think, however, that justifying the application of Chevron that I urge requires less judicial energy than defending a "takings plus" interpretation of a statutory provision that mentions neither "takings" nor state law "pluses." (Ironically, however, I have had to spin out lengthy arguments in order to kill every head of the Hydra presented by this case.)
 
 
 175
 As I understand it, the "takings plus" theory maintains that the "valid existing rights" phrase denies to the Forest Service any regulation that would either constitute a taking or violate a state property right protected to a special or unusual degree. Op. at 1270. This appears to be the only way to reconcile Judge Moore's argument that it would indeed violate "valid existing rights" to stop Stupak-Thrall from obtaining drinking water from Crooked Lake but that it would not violate that provision to ban sailboats and houseboats. Op. at 1270. I fail to see how anyone reading Section 5 of the MWA could reach the conclusion that Congress intended to rely on such a distinction. Sailing and drinking water are both property rights under Michigan law. Granted, Thompson v. Enz categorized the former as an artificial riparian use and the latter as a natural use, but there is nothing whatsoever that authorizes the Forest Service to give this difference in state law any significance when it ponders its permissible scope of regulation. "Rights" is used as a unified term in Section 5 of the MWA. Judge Moore's "plus" essentially reads the words "special" or "unusual" into Section 5 of the MWA just after the word "existing." The "takings plus" limitation might be a wonderful public policy that Congress should have adopted as a floor amendment to the MWA. However, Congress did not choose to write the statute that way, and neither should we.
 
 
 176
 The concurrence does not respond to the argument that state or local police powers in Michigan would be sufficient to prevent Stupak-Thrall even from drinking Crooked Lake's water. Like the government's "concession" that it could not prohibit access without violating "valid existing rights," just that it could prohibit every known means of access, the drinking water "concession" is not a concession at all. It is simply an effort to maintain some shred of protection in language that is otherwise shorn of any effectiveness. Under the original state/local police powers theory of the panel, there really is no activity that the Forest Service could not prevent and no state-created property right it could not destroy or disparage.
 
 
 177
 Finally, I respond here to two "loose ends" from the concurrence. Judge Moore continues to ascribe some significance to the fact no evidence was introduced into the record that sailboats were ever used on Crooked Lake. Op. at 1271. This ignores the ripeness analysis I set out in footnote 7 supra, pp. 1275-1276. As a reiteration of the point made therein, consider a regulatory agency attempting to argue that a claim that the seizure of land constituted a taking was not ripe because there was no evidence introduced into the record that the owner ever used or set foot on the parcel of land seized. I suspect our court would not tarry long in rejecting such an argument. Stupak-Thrall had a right to sail and houseboat on Crooked Lake. The damage done by Amendment No. 1 to Stupak-Thrall's riparian property rights was complete when it was passed. Thus, the Lucas denominator issue discussed in Section V.C., pp. 1295-96, is a real question mark that will probably have to faced at some point in related litigation.
 
 
 178
 As I previously indicated in Section V.C., p. 1296, judicial restraint prevents me from offering an opinion about whether Amendment No. 1 is a taking. However, I think Judge Moore's rather sanguine view that prohibiting sailboating and houseboating could not possibly be a taking, simply because these are "occasional" recreational activities, is unwise. Op. at 1271. Obviously, without paying compensation, the government could not seize Riverfront Stadium or the tickets of season ticket holders, simply because a mere "occasional" diversion is involved. See also Kaiser Aetna v. United States, 444 U.S. 164, 167, 100 S.Ct. 383, 386, 62 L.Ed.2d 332 (1979) (holding that the Army Corps of Engineers could not require a private marina used to dock "pleasure" boats in Hawaii to open itself to the public without paying just compensation even when the marina connected to a navigable waterway of the United States). Moreover, the Gajewskis' livelihood and not just their recreational boating is ultimately at stake under the interpretation at issue in this case. Stupak-Thrall's takings claim was dismissed by the district court without prejudice, so she will be able to make such arguments soon enough should she so desire. Also, Stupak-Thrall will probably be entitled to present a takings claim in her challenge in Judge Bell's court to Amendment No. 5 relating to motorboats, if she has not already done so.
 
 
 179
 The concurrence's emphasis, Op. at 1271 n. 6, that the sailboat ban affects no one's livelihood also seems odd. The panel emphasized, Stupak-Thrall II, 70 F.3d at 890, that motorboating with the "bigger fish" at stake in this case; the government at oral argument emphatically asserted that its power to ban motorboating was exactly equal to its power to ban sailboats; and it has in fact attempted to exercise that power by promulgating Amendment No. 5, thus seeking to destroy Major Gajewski's livelihood, until Judge Bell intervened. See supra note 5, p. 1275.
 
 VI
 
 180
 Amendment No. 1 is invalid to the extent it invades the riparian rights of Stupak-Thrall under Michigan law. I reach this result based on a simple reading of the clear text of Section 5 of the MWA. The result I would reach is not catastrophic for the Forest Service or environmental values. The vast majority of Amendment No. 1 would be left intact. It would have no impact on other disturbances of wilderness values. Most importantly, it would not increase pollution. See Section IV., pp. 1286-1287, supra. If authorized to do so, and if it truly believes its own riparian rights are being infringed by Stupak-Thrall, the Forest Service can bring suit in federal court to enjoin Stupak-Thrall's invasion of its rights under the reasonable use doctrine in Michigan riparian law. And, of course, it is always free to ask Congress to enact Amendment No. 1 as law or to change the limits on its authority under Section 5 of the MWA. The important point is that courts must respect those limits unless and until Congress itself changes them.
 
 
 181
 The district court's and the panel's opinion destroyed the legislative bargain inherent in the savings provision, "valid existing rights," contained in Section 5 of the MWA. "[Judicial] review must serve to ensure that the purposes of [an] Act and the legislative compromise it reflects are given effect." United States v. Taylor, 487 U.S. 326, 336, 108 S.Ct. 2413, 2419, 101 L.Ed.2d 297 (1988). In this case the district court, the panel, and the four additional members of the en banc court that voted to affirm broke the legislative compromise without which it might not have been possible to enact the MWA. While some will no doubt celebrate this result as a victory, I believe such an attitude is short-sighted. In the long run, legislators who are tentative about a piece of environmental legislation because they think the relevant regulatory authorities might use it to run roughshod over property interests will hesitate before they agree to vote for such legislation. Perhaps their fears will prevent them from voting for future environmental legislation at all. Indeed, if the members of Congress who pushed to include a "valid existing rights" savings clause in the MWA had had a crystal ball that would have allowed them to see the resolution reached by our court, there never may have been a Sylvania Wilderness for the Forest Service to regulate. By breaking legislative deals like this one, our court ultimately hurts the environmental interests that it appears to help. Courts should interpret and not (un)make the law. The district court's opinion should have been reversed. I respectfully dissent.
 
 
 182
 ALAN E. NORRIS, SUHRHEINRICH, and BATCHELDER, JJ., concur in Judge BOGGS's opinion.
 
 
 
 *
 This Order was originally filed on June 24, 1996, and is now being reissued for full-text publication with a separate concurring opinion by Judge MOORE (pp. 1269-1272), in which Chief Judge MERRITT and Judge DAUGHTREY joined, and a separate dissenting opinion by Judge BOGGS (pp. 1272-1306), in which Judges NORRIS, SUHRHEINRICH, and BATCHELDER joined
 
 
 [1]
 The underlying constitutional, statutory, and regulatory background of this case is fully described in the panel opinion, Stupak-Thrall v. United States, 70 F.3d 881 (6th Cir.1995), vacated, 81 F.3d 651 (6th Cir.1996), and is not repeated here
 
 
 [2]
 Michigan Wilderness Act, Pub.L. No. 100-184, 101 Stat. 1274; Wilderness Act of 1964, 16 U.S.C. § 1133(c). This assumption in favor of the plaintiffs' position properly allows the court to reach the critical issue in this case: the meaning of "subject to" valid existing rights
 
 
 [3]
 The phrase, "subject to valid existing rights," is indeed ambiguous. The University of Kentucky's Journal of Mineral Law & Policy, for instance, has devoted an entire 375-page issue to trying to untangle the phrase. See Symposium on Valid Existing Rights, 5 J. Min. L. & Pol'y 381 (1989-90). The fact that Judge Boggs's interpretation of "subject to" contradicts a longstanding Interior Department interpretation, see Interpretation of Section 603 of the Federal Land Policy and Management Act of 1976--Bureau of Land Management (BLM) Wilderness Study, 86 Int. Dec. 89, 116 (1978), and the fact that the court is so evenly divided on what it means to say "subject to" valid existing rights, would seem to indicate that the phrase is not the model of clarity Judge Boggs would have us believe
 
 
 [4]
 The Takings Clause states: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V
 
 
 [5]
 Judge Boggs responds that certain restrictions affecting valid existing rights, such as those requiring life preservers on sailboats, would not violate his interpretation of the "subject to" proviso, yet his explanation for this conclusion falls far short. He points out that there has never been a right "to sail without life preservers" under Michigan law, only a right to sail, and Amendment No. 1 "destroys the riparian right to sail in its entirety." Dissenting opinion at 1287. The problem with this approach is that it takes each potentially permissible riparian use--"fishing, wading, bathing, swimming, washing sheep, watering cattle, pigs, and horses, washing vehicles and clothing, cutting ice, boating, sailing, etc.," Dissenting opinion at 1297 n. 33 (citing People v. Hulbert, 131 Mich. 156, 91 N.W. 211, 212 (1902))--as a discrete, unconditional property "right" equivalent to a fee simple land right, instead of looking at the plaintiffs' general right, as a whole, to use Crooked Lake in a reasonable manner. There is no basis for defining property rights in this way under Michigan law. There is no reason to think that a regulation requiring life preservers (or first-aid kits, or navigational equipment, or safety inspections) is necessarily less intrusive on the single riparian use of sailing than prohibition of that single riparian use (which arguably has never taken place) on the whole of plaintiffs' usufructuary right in the surface of the lake. Indeed, Judge Boggs's assumption that each riparian use is a separate and absolute property right on its own is almost ironic, given his criticism of the difficulty in defining the "denominator" of the entitlement in a takings analysis. Dissenting opinion at 1295-1296. Judge Boggs's approach rests unavoidably on the premise that each permissible riparian use may count as an individual entitlement--a discrete denominator that cannot be destroyed "in its entirety"--but there is absolutely no support for defining the denominator of the entitlement in this fashion
 
 
 [6]
 The dissent's analogy to the seizure of Cincinnati's Riverfront Stadium "or the tickets of season ticket holders" is completely inapt. Although activities at the stadium might reasonably be classified as "occasional and recreational," they are also manifestly more than that. Such activities constitute the entire basis for owning Riverfront Stadium, or for investing in personal property like season tickets. In other words, Judge Boggs again errs by assuming the "denominator" of the entitlement to be whatever best suits his argument. In the instant case, no one disputes that sailboat use on Crooked Lake, if any, has been nothing more than a peripheral use of little moment. A far more appropriate analogy to this case, from a takings standpoint, would be government regulations prohibiting horse racing or gambling at Riverfront Stadium
 
 
 [1]
 The length of this opinion stems not from its complexity but from the need to rebut the profusion of theories that have been advanced to defend the validity of the Forest Service regulation at issue in this case. The affirmative reasoning of this opinion can stand alone on the basis of the factual discussion in Section I and the legal analysis in Sections III-IV
 
 
 [2]
 Stupak-Thrall and the Gajewskis are the plaintiffs in this suit. Hereinafter they are collectively referred to as "Stupak-Thrall." When only Stupak-Thrall herself is intended, her entire name is used: "Kathy Stupak-Thrall." If the Gajewskis are separately referenced, they are termed "the Gajewskis."
 
 
 [3]
 Following the convention employed by the panel opinion, I hereafter refer to these rights as riparian rights, even though, technically speaking, they are littoral rights in common law parlance. Stupak-Thrall v. United States, 70 F.3d 881, 883 n. 2 (6th Cir.1995) [hereinafter Stupak-Thrall II ]. See Black's Law Dictionary 842 (5th ed.1979) (contrasting littoral rights (ocean, seas, and lakes) with riparian rights (rivers and streams))
 
 
 [4]
 Amendment No. 1 prohibits or limits many activities in the Sylvania Wilderness. Most of the provisions in Amendment No. 1 have absolutely nothing to do with riparian rights. Stupak-Thrall claims to be challenging the entirety of Amendment No. 1, but, putting aside the question of severability (see Section IV, pp. 1288-89) she cannot be permitted to do so because it is clear that: (1) she only has standing to challenge those portions of Amendment No. 1 that affect her riparian rights (Amendment No. 1 does not purport to regulate conduct occurring on private land outside the Sylvania Wilderness); and, (2) she can only be challenging those portions of Amendment No. 1 that actually diminish her riparian rights. See 13 Charles A. Wright Arthur R. Miller, Edward H. Cooper, Federal Practice and Procedure § 3531.7, at 516 (1984) (discussing Section 10(a) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which limits the availability of judicial review to those who have been "aggrieved by agency action within the meaning of a relevant statute"). The Supreme Court has held that this provision in the APA invokes the "zone of interests" test in prudential standing analysis. See Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153-54, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970). Amendment No. 1, for instance, prohibits the use of bicycles in the Sylvania Wilderness. Because the use of bicycles has nothing to do with riparian rights, unless the use of a very special kind of bicycle is contemplated, Stupak-Thrall cannot challenge this aspect of the regulation
 Similarly, Stupak-Thrall claimed, as the district court noted, that Amendment No. 1's regulation of the use of electronic fish-finders and boom-boxes also diminished her riparian rights. Stupak-Thrall v. United States, 843 F.Supp. 327, 328 (W.D.Mich.1994), aff'd 70 F.3d 881 (6th Cir.1995), vacated, 81 F.3d 651 (6th Cir.1996) [hereinafter "Stupak-Thrall I "]. In point of fact, however, Amendment No. 1 is only precatory or supplicatory. It states that the Forest Service shall, "Discourage the use of electronic fish-finders, boom boxes and other mechanical or battery-operated devices." Thus, Stupak-Thrall cannot realistically be challenging this regulation on the basis that it constitutes some infringement of her riparian rights, as the Forest Service could have simply asked her not to use fish-finders, etc. on Crooked Lake, before the adoption of Amendment No. 1. A challenge to the discouragement of electronic devices might be cognizable if there was any evidence that in practice the policy equaled a ban or near-ban in its effect. But Stupak-Thrall points to no such evidence in the record. Stupak-Thrall can therefore only properly be challenging Amendment No. 1's ban on houseboats, sailboats, and the use of nonburnable disposable food and beverage containers--those activities singled out before the district court which have some plausible nexus with her use of the water in the lake.
 The government also correctly points out that Stupak-Thrall's challenge to permitting requirements in Amendment No. 1 has been waived. This argument was first raised in Stupak-Thrall's reply brief. Wright v. Holbrook, 794 F.2d 1152, 1156-57 (6th Cir.1986) (considering issue raised for the first time in reply brief to be waived). An interesting question is whether an argument urged for the first time to the panel in a reply brief is still waived after the case is taken up by the entire court en banc and the issue is raised in the supplementary brief. The better view would be to hold that the issue is still waived, as the appellant would otherwise be allowed to deprive the panel of the ability to address the issue first. This approach would have the advantage of possibly obviating the need to en banc a case. Moreover, Stupak-Thrall's permitting argument seems to be frivolous. Amendment No. 1 appears to require the issuance of permits only for campsite usage, not for sailing, houseboating, or the exercise of other riparian rights.
 
 
 [5]
 The court can take judicial notice of this fact, as it is the subject of separate litigation by the same plaintiffs, also in the Western District of Michigan. See Fed.R.Evid. 101, 201(f), 1101(a). A different district judge of that court has issued a preliminary injunction against Amendment No. 5. Stupak-Thrall v. Glickman, No. 2:96-CV-054, 1996 WL 466524 (W.D.Mich. May 15, 1996). The fact that Amendment No. 5 itself is a public document provides an independent reason to take judicial notice of the regulation's effects
 
 
 [6]
 Section 3(a) of the MWA, as well as Section 5, contains "valid existing rights"-like language. Section 3(a) is the provision of the MWA incorporating the Nordhouse Dunes area of the Manistee National Forest into federal wilderness system. (Section 3(b), which specifically created the Sylvania Wilderness, does not contain valid existing rights language.)
 
 
 [7]
 Neither Kathy-Stupak Thrall nor the Gajewskis appear to have submitted any evidence that they had attempted to engage in any of the uses of Crooked Lake prohibited by Amendment No. 1. In fact, the district court found no evidence in the record that sailboats or houseboats had ever been used on Crooked Lake. Stupak-Thrall I, 843 F.supp. at 334. Thus, although the government did not raise this issue, it would seem that a ripeness problem may exist with the plaintiffs' suit. The plaintiffs' challenge to Amendment No. 1 is ripe, however, because of the nature of their rights under state law. See Bauman v. Barendregt, 251 Mich. 67, 231 N.W. 70, 71 (1930) (riparian rights "constitute[ ] one of the advantages of [the land's] situation, and [are] a material part of its value, and enter[ ] largely into the consideration of acquiring it.") By diminishing their rights in land, the value of the plaintiffs' land is immediately reduced by Amendment No. 1, making any challenge to the regulation's validity ripe. See Martino v. Santa Clara Valley Water Dist., 703 F.2d 1141, 1146 n. 2 (9th Cir.1983) (holding that a takings challenge to an ordinance prohibiting development was ripe despite the fact that the plaintiffs had not submitted a development plan and subsequently been turned down by municipal authorities--"[The plaintiffs] do not claim only that the ordinance in question effected a 'taking' as applied to a particular permit or variance application; they also contend that there was a 'taking' by virtue of the mere enactment of [the ordinance]."). Cf. Eli Lilly & Co. v. EPA, 615 F.Supp. 811, 819 (S.D.Ind.1985) (due process challenge to regulation is ripe when the factual allegations of a complaint make it clear that plaintiff has been deprived of a property right without being afforded due process of law). In this case, Kathy Stupak-Thrall and the Gajewskis are similarly challenging the mere enactment of Amendment No. 1, which by its terms eliminates the riparian rights they had under state law to sail and use houseboats on Crooked Lake--a regulatory action they say exceeds the Forest Service's powers under the MWA. Under these particular cases and the two-part test for ripeness in Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515-16, 18 L.Ed.2d 681 (1967), this case is ripe for judicial review. The court can infer from the government's failure to raise the issue of ripeness that enforcement is certain. Therefore, the hardship element of the test is met. Regional Rail Reorganization Act Cases, 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974). And, under the second part of the test, the issues in this case are purely legal, so they are fit for judicial review
 
 
 [8]
 "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States...." U.S. Const. art. IV., § 3, cl. 2
 
 
 [9]
 "The Congress shall have the Power.... To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art I, § 8, cl. 18
 
 
 [10]
 Ben Thrall was a party to the administrative appeal with the Forest Service, but was not included as a plaintiff in the action filed in district court
 
 
 [11]
 If the assumption is invalid, then only the United States and the 13 private riparians on Crooked Lake have rights to use the waters of Crooked Lake and have ownership of the bed of the lake. The State of Michigan would have no rights in the lake, arguably increasing the relative importance of the United States' ownership interest and weakening Stupak-Thrall's argument
 
 
 [12]
 It is an open question under Michigan law whether the public possesses recreational rights incident to its navigation rights similar to the recreational rights of riparian owners:
 This Court has not been called upon to decide whether, and the extent to which, boating, as such, and other recreational uses are incidents of the navigational servitude and whether a distinction should be drawn in that regard between (i) waters in which riparian or littoral owners do not own the bed (the Great Lakes), (ii) waters in which they own the bed and which are navigable in fact (by ship), (iii) waters in which they own the bed and which are qualifiedly navigable (by log flotation), and (iv), assuming adoption of a recreation-boating test, large and small inland rivers and lakes.
 Bott v. Commission of Natural Resources, 415 Mich. 45, 327 N.W.2d 838, 843 (1982) (footnote omitted). This has been the last word on the subject by the Michigan Supreme Court, although the Bott court noted that Kerley v. Wolfe, 349 Mich. 350, 84 N.W.2d 748 (1957), held that the public had a right to fish incident to its right to navigate and boat. Bott, 327 N.W.2d at 843 n. 17.
 
 
 [13]
 Riparian owners own the bed of all lakes they own land adjacent to, except the Great Lakes. Obrecht v. National Gypsum Co., 361 Mich. 399, 105 N.W.2d 143, 149-51 (1960)
 
 
 [14]
 Section 4(d)(1) of the Wilderness Act, 16 U.S.C. § 1133(d)(1), specifically permits the Secretary of Agriculture to allow motorboating to continue where it had already become established
 
 
 [15]
 "The government concedes also that plaintiffs' riparian rights are probably protected anyway under the Wilderness Act's provision regarding 'existing private rights,' which is incorporated by reference into the MWA. We therefore proceed under the assumption that riparian rights may be protected under either of the phrases 'valid existing rights' or 'existing private rights.' " Stupak-Thrall II, 70 F.3d at 884 n. 3. This footnote is an indication of the cavalier way in which the government and the panel dealt with the text of the relevant statutes
 
 
 [16]
 "Dam Hetch Hetchy! As well dam for water-tanks the people's cathedrals and churches, for no holier temple has ever been consecrated by the heart of man." Rosenberg, 27 Loy. L.A. L.Rev. at 1049 n. 2 (quoting Joseph M. Petulla, American Environmental History, 320 (2d ed.1988) (quoting John Muir))
 
 
 [17]
 The government construed Stupak-Thrall's argument against the Organic Act as a source of authority for Amendment No. 1 as a non-delegation argument. As the government correctly pointed out, such an argument is "barely worthy of a footnote" in the modern administrative state, citing United States v. Brown, 552 F.2d 817, 823 n. 8 (8th Cir.), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). "[T]he nondelegation doctrine has fallen into desuetude and may be a dead letter." Leading Cases, 108 Harv. L.Rev. 300, 309 (1994) (citing Gary Lawson, The Rise and Rise of the Administrative State, 107 Harv. L.Rev. 1231, 1240 (1994)). But see, infra Section V.E., pp. 1299-1300. As the comment in the Harvard Law Review indicates, however, the concerns about democratic legitimacy behind the non-delegation doctrine have not disappeared. Indeed, these concerns animate the review of agency action under the Chevron doctrine
 Stupak-Thrall argues that the panel reasoned that the powers granted to the Forest Service by the Organic Act and by the National Forest Management Act of 1976 ("NFMA") were very broad and coextensive with Congress's powers under the Property Clause, citing Duncan Ener. Co. v. United States Forest Serv., 50 F.3d 584, 588-89 (8th Cir.1995) (a case not cited by the government). Stupak-Thrall II, 70 F.3d at 887 & n. 6. Stupak-Thrall misinterpreted the panel's analysis. See Stupak-Thrall II, 70 F.3d at 888 (recognizing that this case is different from Duncan because of certain limitations placed on the Forest Service's authority in the MWA). If the Organic Act and NFMA delegated powers coextensive with the Property Clause to the Forest Service whenever it has territorial jurisdiction, then the panel could have stopped analyzing the question raised about the Forest Service's authority at that point in its opinion, which it did not do. (Duncan is also distinguishable from this case because it does not involve a wilderness area designated under the Wilderness Act or later wilderness act like the MWA. It involved only the administration of a national forest. As such, the Forest Service's powers under the Organic Act, whatever their extent, were not limited in Duncan by specific language such as that contained in Section 5 of the MWA, which is the crucial text here.)
 
 
 [18]
 The relevant portion of 16 U.S.C. § 480 provides as follows:
 [T]he intent and meaning of this provision being that the State wherein any such national forest is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State.
 
 
 [19]
 The panel interpreted § 480 to apply only to those "rights," "privileges," and "duties" that "pertain to the state's exercise of jurisdiction." Stupak-Thrall II, 70 F.3d at 888. While this is perhaps a plausible interpretation, as § 480 does provide for concurrent federal-state jurisdiction, it is not the only plausible interpretation. After all, what is a jurisdictional "privilege?" A less-strained reading of § 480 seems to protect from the Organic Act's sweep ordinary privileges and rights, including property rights
 
 
 [20]
 Stupak-Thrall made the argument in her supplemental brief on rehearing en banc that her rights are "more" than "valid existing rights;" they are vested rights. The distinction may be important to takings analysis, but it is unimportant in this case for two reasons. First, there is no reason to construe the term "valid existing rights" to be coextensive with the takings clause. See Section V.C., pp. 1294-1296 & V.F., pp. 1302-1305, infra. Second, the MWA uses the term "valid existing rights," not the term "vested rights," so whatever vested rights are, they are irrelevant to the statutory analysis required by this case
 
 
 [21]
 That Congress intended the "rights" referred to in this statute to be concrete rights is also clear from the redundant usage of "valid existing rights" in Section 3(a) of the MWA, which speaks of "reasonable access" to exercise "valid existing rights." Section 3(a) can be used as an aid to construe Section 5 because the same terms used in different sections of the same statute are presumed to have the same meaning. Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 2503-04, 110 L.Ed.2d 438 (1990). Physical access to an intellectual abstraction is of course an absurdity, so we can safely deduce that Congress intended the concrete meaning of the word "right."
 
 
 [22]
 I quote it at length so as not to be accused of taking the government's representations at oral argument out of context. Michigan distinguishes between so-called natural uses of waters and artificial uses. See, e.g, Thompson v. Enz, 379 Mich. 667, 154 N.W.2d 473, 483 (1967) (artificial uses of water are subject to a reasonable use limitation (see below)). There is no hint of this distinction in the government's responses to the questions at oral argument noted below. The government did not maintain that Stupak-Thrall had only an artificial riparian right to swim, etc., but that she had no such right at all. The government claims that Stupak-Thrall had simply never been stopped from swimming. This is obviously a very different argument than the one that depends on the artificial/natural distinction in Michigan riparian law
 
 
 [23]
 In their complaints, Kathy Stupak-Thrall and the Gajewskis challenged Amendment No. 1 as arbitrary and capricious, but this argument was not pressed on appeal. Judging by the district court's silence on this issue, it was dropped at that level, as well
 
 
 [24]
 Judge Scalia noted:
 Ordinarily ... challengers to a law are not permitted to raise the rights of third parties and can only assert their own interests. In overbreadth analysis, those rules give way: challengers are permitted to raise the rights of third parties; and the court invalidates the entire statute, "on its face," not merely "as applied," so that the overbroad law becomes unenforceable until a properly authorized court construes it more narrowly. The factor that motivates courts to depart from the normal adjudicatory rules is the concern with the "chilling," deterrent effect of the overbroad statute on third parties not courageous enough to bring suit.
 United Presbyterian Church in the USA v. Reagan, 738 F.2d 1375, 1379 n. 1 (D.C.Cir.1984) (citing Gerald Gunther, Cases and Materials on Constitutional Law 1186-87 (10th ed.1980)).
 
 
 [25]
 Even if Stupak-Thrall was sailboating or houseboating unreasonably within the meaning of Michigan law, the Forest Service would not be without a remedy, if it has been empowered to bring suits by Congress. It could bring suit under Michigan riparian law against Stupak-Thrall. Stupak-Thrall is wrong in maintaining that such an action would have to be brought in state court, however. The forum chosen by the Forest Service to press a "reasonable use" claim under Michigan riparian law would likely be a federal one, as the federal district courts have jurisdiction over civil actions commenced by agencies possessing such power. 28 U.S.C. § 1345. The Forest Service could also choose to bring a suit in Michigan state court, however, as the jurisdiction granted by § 1345 is not exclusive. But it would not be required to do so
 
 
 [26]
 In defending the panel's analysis, the concurrence states that I could understandably find the panel's reasoning a non sequitur because Part III of that opinion, Stupak-Thrall II, 70 F.3d at 886-88, actually contained the panel's analysis of "this point," not Part IV, id. at 888-91. Op. at 1271. As I read the panel's opinion, Part III makes various general arguments about the authority the Forest Service would possess under its Organic Act and the Wilderness Act if the "valid existing rights" phrase were not present in Section 5 of the MWA. Part III also rejects certain arguments made by the plaintiffs based on RARE II and 16 U.S.C. § 480. In my view, the "meat" of the panel's opinion is contained in Part IV, which begins, rather portentously, "What distinguishes this case from others applying the Property Clause is that the statutory scheme appears to make explicit room for state law." Id. at 888. In Part IV, the panel addressed Stupak-Thrall's "valid existing rights" argument. It seems obvious to me that Part IV is the heart of the panel's opinion because the question of whether the Forest Service would possess the power to promulgate Amendment No. 1 if there were no "valid existing rights" limitation on its power assumes away the central problem we face in this case. Indeed, footnote 2 to the concurrence, Op. at 1269, states that "the critical issue in this case [is] the meaning of 'subject to' valid existing rights."
 
 
 [27]
 While the letter refers exclusively to motorboats and this case does not involve motorboats, the significance of the Morton letter is that it is evidence that the Forest Service and Congress knew that the "valid existing rights" language in Section 5 of the MWA protected one subset of Michigan riparian rights. The next step in the analysis is to recognize that Section 5 of the MWA does not limit itself to only riparian rights in the use of motorboats. Rather, it protects riparian rights generally
 
 
 [28]
 "[N]or shall private property be taken for public use without just compensation." U.S. Const. amend. V
 
 
 [29]
 The concurrence notes that the Ninth Circuit cited Andrus approvingly in Adams v. United States, 3 F.3d 1254, 1259 (9th Cir.1993), a case involving the regulation of a claimed easement across government-owned land. Op. at 1270. Adams referred to Andrus in a "see also" cite for the proposition that easement rights can be regulated. The mere citation to Andrus in Adams cannot sustain the panel's unnatural interpretation of "valid existing rights" in the MWA. Consider first that Adams involved a different statute than is involved either in this case or in Andrus--the Alaska National Interest Land Conservation Act ("ANILCA"). Second, ANILCA apparently does not include a "valid existing rights" provision (no such provision was cited by the Adams court). Moreover, ANILCA provides that "Notwithstanding any other provision of law and subject to such terms and conditions as the Secretary of Agriculture may prescribe, the Secretary shall provide such access to nonfederally owned land within the boundaries of the National Forest System as the Secretary deems adequate to secure the owner the reasonable use and enjoyment thereof...." (Emphasis added.) Unless one argues that the phrase "subject to" in ANILCA is ambiguous, as the concurrence claims in relation to the MWA, it is clear that ANILCA specifically permits the regulation of easement rights. Thus, Adams is completely distinguishable from Andrus and the result in Adams in no way depends on Andrus. Finally, the concurrence does not consider Ninth Circuit precedent that actually addresses the question of how to construe the "valid existing rights" phrase in other statutes. See, e.g., Shultz v. Department of the Army, 10 F.3d 649, 662 (9th Cir.1993) (Fletcher, J.) (private landowner had easement across Army base to reach his land because his easement predated the enactment of a statute giving the Army power to withdraw land from private use "subject to valid existing rights"). In Shultz, the Ninth Circuit, when actually presented with the question of how to construe the "valid existing rights" phrase, did not invoke takings analysis, but rather interpreted the phrase to have its most natural meaning
 
 
 [30]
 Some commentators have suggested that footnote 7 of Lucas has been rejected by the Court in Concrete Pipe and Prods. of Calif., Inc. v. Construction Laborers Pension Trust for S. Calif., 508 U.S. 602, 643-44, 113 S.Ct. 2264, 2290-91, 124 L.Ed.2d 539 (1993). I read Concrete Pipe to reject the argument that there is a denominator issue involved in non-physical property rights cases. Concrete Pipe explicitly distinguished Lucas on this basis and Justice Scalia, Lucas 's author, joined Justice Souter's opinion in Concrete Pipe. Concrete Pipe involved a takings claim related to rights in a pension plan, not physical rights to use land or water
 
 
 [31]
 The concurrence argues that it is "ironic" to note that Michigan law defines riparian rights discretely while discussing the Supreme Court's analysis of the denominator problem in takings law. Op. at 1270 n. 5. There is no inconsistency, as footnote 7 of Lucas suggests that the denominator problem can be solved by recognizing the expectations created by the way "particular" (read "discrete") rights are defined under state property law
 
 
 [32]
 Peterman v. State, 446 Mich. 177, 521 N.W.2d 499, 507-08 (1994) (" 'riparian rights are property' and as such are protected by the limits of the power of eminent domain") (quoting Bott v. Commission of Natural Resources, 415 Mich. 45, 327 N.W.2d 838, 850 (1982)); Hess v. West Bloomfield Township, 439 Mich. 550, 486 N.W.2d 628, 633 (1992) ("Riparian rights are derived from and are dependent on ownership of 'land' which abuts a natural body of water; thus, they constitute part of the property possessed by riparian landowners and become their property rights."); Hilt v. Weber, 252 Mich. 198, 233 N.W. 159, 168 (1930) ("Riparian rights are property, for the taking or destruction of which by the state compensation must be made unless the use has a real and substantial relation to a paramount trust purpose."); Loranger v. City of Flint, 185 Mich. 454, 152 N.W. 251, 252 (1915) ("riparian property rights"); Attorney Gen. ex rel. Emmons v. City of Grand Rapids, 175 Mich. 503, 141 N.W. 890, 899 (1913) ("The rights of the riparian owners on a stream to the use of the water are property rights....")
 
 
 [33]
 Bauerle v. Board of County Road Comm'rs for the County of Charlevoix, 388 Mich. 520, 201 N.W.2d 799, 801-02 (1972) (use of whole lake for boating and fishing); Thompson v. Enz, 379 Mich. 667, 154 N.W.2d 473, 475 (1967) (household purposes, swimming, fishing, water skiing, "or any of those general purposes normally permitted to riparian owners"); Kerley v. Wolfe, 349 Mich. 350, 84 N.W.2d 748, 751-52 (1957) (canoeing, boating, fishing); Hall v. Wantz, 336 Mich. 112, 57 N.W.2d 462, 464 (1953) (use of whole lake for boating and fishing); Burt v. Munger, 314 Mich. 659, 23 N.W.2d 117, 119 (1946) (same) (citing Inhabitants of West Roxbury v. Stoddard, 89 Mass. (7 Allen) 158 (1863)); Swartz v. Sherston, 299 Mich. 423, 300 N.W. 148, 150 (1941) (same); Bauman, 231 N.W. at 71 (Mich.1930) (right to fish anywhere in the lake); Manney v. Prouse, 248 Mich. 655, 227 N.W. 685, 686 (1929) (use of whole lake for boating and fishing); Beach v. Hayner, 207 Mich. 93, 173 N.W. 487, 488 (1919) (fishing, fowling, boating, bathing, skating, riding upon the ice, taking water for domestic or agricultural purposes, or for use in the arts, and the cutting and taking of ice) (citing Stoddard ); Hulbert, 91 N.W. at 211-12 ("fishing, wading, bathing, swimming, washing sheep, watering cattle, pigs, and horses, washing vehicles and clothing, cutting ice, boating, sailing, etc.") (emphasis supplied); Pierce v. Riley, 81 Mich.App. 39, 264 N.W.2d 110, 114 (1978) (per curiam) (use of whole lake for boating, swimming, fishing "and other similar riparian rights"); Kurrle v. Walker, 56 Mich.App. 406, 224 N.W.2d 99, 101-02 (1974) (right of access to water, boating, swimming, water skiing, fishing, ice skating, sledding, or other aquatic sports on the whole surface and sub-surface waters of the lake) (citing Rice v. Naimish, 8 Mich.App. 698, 155 N.W.2d 370, 372 (1967)); Opal Lake Ass'n v. Michaywe' Ltd. Partnership, 47 Mich.App. 354, 209 N.W.2d 478, 485 (1973) (use of whole lake for boating and fishing)
 
 
 [34]
 Peterman, 446 Mich. 177, 521 N.W.2d 499 at 511 (unconstitutional taking and violation of due process under state law, although relying heavily on United States Supreme Court cases, for Michigan Department of Natural Resources to construct jetties to protect its boat launch in a way that altered the natural deposition of sand on the plaintiffs' beach, destroying their riparian right to the natural deposition of sand); City of Grand Rapids, 141 N.W. at 902-04 (taking and violation of due process under state law for city to dump sewage into river, polluting it and thereby destroying the riparian rights of those with land abutting the river)
 
 
 [35]
 Moreover, one doubts whether the distinction drawn in Thompson would actually be enforced by Michigan courts. If a riparian really was capable of draining a body of water to slake his thirst or that of his livestock, would a fellow riparian really be helpless to stop the riparian with the nearly unquenchable thirst? If Michigan courts would enjoin the extremely thirsty riparian and attempt to work out an equitable sharing of limited water resources, then the distinction between artificial and natural riparian rights exists only academically and has no legal significance
 
 
 [36]
 Another House committee report, from the Committee on Agriculture, adds nothing to the insights into legislative history of the MWA to be derived from the House Committee on Interior and Insular Affairs. H.R. Rep. 29, 100th Cong., 1st Sess., pt. 2 (1987). The Senate report from the Committee on Agriculture, Nutrition, and Forestry, also largely adds nothing to what can be gleaned from the report of the House Committee on Interior and Insular Affairs, with one exception. The Senate report indicates that the "mineral" rights Congress was especially concerned with in the Nordhouse Dunes Wilderness area actually were a "high potential for the occurrence of natural gas underlying the area." S. Rep. 206, 100th Cong., 1st Sess., at 4 (1987). The government concedes that the legislative history of the Wilderness Act is unhelpful for resolving the issue of the meaning of "valid existing rights" in Section 5 of the MWA
 
 
 [37]
 D'Amato's article consists of 6 pages. See also Boris I. Bittker, Interpreting the Constitution: Is the Intent of the Framers Controlling? If Not, What Is?, 19 Harv. J.L. & Pub. Pol'y 9 (1995) (45 pages); Robert C. Power, The Textualist: A Review of the "Constitution of 1887: A Commentary," 84 Nw. U.L.Rev. 711 (1990) (reviewing George Anastaplo) (1989) (24 pages); Francis J. Mootz, III, The Ontological Basis of Legal Hermeneutics: A Proposed Model of Inquiry Based on the Work of Gadamer, Habermas, and Ricoeur, 68 B.U. L.Rev. 523 (1988) (94 pages); Gary Peller, The Metaphysics of American Law, 73 Calif. L.Rev. 1151 (1985) (139 pages). Of course, not all of the ink in these articles was spilled on the topic of the 35 year-old President. But neither are all of the articles in the symposium cited by Judge Moore, or all of the text of the relevant articles, devoted to demonstrating that the phrase "valid existing rights" is ambiguous
 
 
 [38]
 See Steven G. Calabresi & Saikrishna B. Prakash, The President's Power to Execute the Laws, 104 Yale L.J. 541 (1994) (124 pages); David L. Faigman, "Normative Constitutional Fact-Finding": Exploring the Empirical Component of Constitutional Interpretation, 139 U. Pa. L.Rev. 541 (1991) (71 pages); Richard H. Fallon, Jr., A Constructivist Coherence Theory of Constitutional Interpretation, 100 Harv. L.Rev. 1189 (1987) (97 pages); Richard A. Posner, Law and Literature: A Relation Reargued, 72 Va. L.Rev. 1351 (1986) (41 pages); Erwin Chemerinsky, Wrong Questions Get Wrong Answers: An Analysis of Professor Carter's Approach to Judicial Review, 66 B.U. L.Rev. 47 (1986) (22 pages); Frank H. Easterbrook, Statutes' Domains, 50 U. Chi. L.Rev. 533 (1983) (19 pages)